Davis, Judge,
delivered tbe opinion of the court:
This reference[1] from the Senate involves the destruction of 250 tons of cottonseed allegedly caused by an inspector of the United States Department of Agriculture. Plaintiff, Balph Feffer and Sons, is a partnership seeking recovery on behalf of an Arizona corporation, the Delinking and Seed Treating Company;[2] plaintiff’s partners appear to be the sole (or major) stockholders of that corporation (see finding 1). The asserted basis of the Government’s liability is a supposedly negligent misrepresentation of a Department of Agriculture inspector, in late 1952 or January 1953, relating to the heat to which cottonseed could be subjected to eradicate pink bollworm infestation without, at the same time, harming the viability of the seed.
*508 Considered in its legal setting, tbe claim, sounding in tort, would clearly fail under tbe applicable statutes of limitation and would also fall because it does not present any actionable wrong. Tbe bill for plaintiffs relief (S. 2243) was not introduced in the Senate until June 24, 1959, and the petition in this court was not bled until September 3,1960. Tbe two-year statute of tbe Federal Tort Claims Act (28 U.S.C. § 2401(b)) and tbe six-year independent statute for suits in the Court of Claims (28 U.S.C. § 2501) both bar tbe claim, tbe critical events having occurred more than six years prior to the introduction of the bill (if that is assumed to stop the running of limitations). Moreover, recovery against tbe United States under tbe Tort Claims Act for negligent or willful misrepresentations is expressly precluded by 28 U.S.C. § 2680 (b). E.g., United States v. Neustadt, 366 U.S. 696 (1961); O'Donnell v. United States, ante, p. 109. Accordingly, we must bold that plaintiff and tbe Delinting Co. have no legal claim under existing law.
“On tbe other band, to tbe extent that we are asked to consider tbe claim in its ‘equitable’ facets — with that somewhat special meaning which has heretofore been given that term in Congressional reference cases — we are freer to comment upon tbe content and application of tbe legal rules which would control tbe legal claim.” Estate of Fairbank v. United States, 164 Ct. Cl. 1, 8-9 (1964). Tbe next question, therefore, is whether tbe time-bar ought in good conscience to be lifted. Our Trial Commissioner has made no findings on that point nor has plaintiff proposed any such findings or excepted to tbe Commissioner’s failure to cover that issue. Plaintiff and tbe Delinting Co. have elected to stand on the Commissioner’s report and have submitted their case to the court without brief or argument. Nothing has been brought to our attention excusing the more than six-year delay in taking steps to protect the claim. Accordingly, we cannot say that the time-bar ought, in equity, to be removed. See Group v. United States, 165 Ct. Cl. 612, 616 (1964); Estate of Fairbank v. United States, supra, p. 11.
Despite plaintiff’s lack of a showing that its delay should be forgiven, we go on to consider the circumstances of its claim because the Senate, in making this reference through *509 Senate Kesolution No. 140, 86th Cong., 2d Sess., was primarily concerned with the factual dispute between the Department of Agriculture and the plaintiff relating to the material happenings in late 1952 and early 1953. The Keport of the Judiciary Committee emphasizes that “since there is definite conflict as to the facts of how the cottonseed was damaged, the committee is of the view that this matter is one properly to be determined by the Court of Claims and a report rendered to the Congress thereon.” S. Rep. No. 1433, 86th Cong., 2d Sess. 3 (1960).
The United States Department of Agriculture, with power to regulate the movement of infested plants and plant products in interstate commerce, also cooperates with local authorities with respect to control of the intrastate transfer of such plants. That was the situation in Arizona, in late 1952 and early 1953, after pink bollworm infestation of cottonseed had been discovered in several of the counties of that State. George B. Ray was a Department of Agriculture area inspector whose jurisdiction included Arizona although his headquarters were located in El Paso, Tex. He was in charge of the Pink Bollworm Control Project of the Bureau of Entomology and Plant Quarantine for his area and one of his duties was to see that cottonseed infested with pink bollworm was treated in accordance with state and federal regulations to eliminate the condition. Mr. Ray is the Government official who is claimed to haye caused the damage to plaintiff and the Delinting Co.
Sometime in December 1952, Ralph B. Feffer, Sr., president of the Delinting Co., learned that cottonseed from an area of Arizona infested with pink bollworm had been shipped to his company’s delinting plant. An Arizona official (the County Extension Entomologist) informed him that the seed would have to be sterilized or fumigated before it could be removed from the plant. The Delinting Co. was not in the business of treating cottonseed for pink bollworm. Its plant, insofar as pertinent here, was used only to delint cottonseed (i.e., to remove the outer fuzz from the seed), a procedure which improves the planting and germinating qualities. In accomplishing this, the company used a sul- *510 pburic acid batb technique it had developed, the details of which were its trade secret.[3] Used in the process was a dryer which removed the moisture from the seed after it had been run through the acid bath and washed with water. For the 1952-1953 delinting season, a new dryer had been installed at the plant, apparently because it had a greater capacity than the older equipment.[4]
In the latter part of December 1952, George McLain, Ray’s subordinate, visited the Delinting Co. plant in connection with the infested seed which had been delivered. State and federal regulations for sterilizing cottonseed for pink bollworm required that the seed be heated to a temperature of 150 degrees F. for a period of at least thirty seconds or, otherwise, be fumigated with methyl bromide. Mr. Feffer discussed the acid bath process with Mr. McLain for the purpose of having that technique approved for the elimination of the bollworm. McLain told him that approval for any equipment or process would have to come from his superior, Mr. Ray. McLain and Feffer also seem to have discussed the dryer as a method of sterilization.
The record is not entirely clear whether it was before or after this meeting with McLain that Mr. Feffer ordered a larger burner for the dryer. The burner was ordered on December 22d or 23d and installed prior to December 30th. It is reasonable, however, to conclude that the new burner was purchased because Mr. Feffer believed it was necessary in order to have the dryer approved as a bollworm sterilizer. We say this because the purchase appears to have been the outcome of Mr. Feffer’s learning, from McLain, of the state *511 and federal regulations requiring tliat tbe cottonseed be heated to 150 degrees F. — taken together with Mr. Feffer’s own belief that the previously used smaller burner could not provide enough heat to meet the standard. We also infer from this that Mr. Feffer had not strenuously urged the use of the acid bath process with low-heat drying as a sufficient means of sterilization.
A letter was sent to Mr. Feffer by Mr. McLain on December 30,1952 which, in pertinent part, said:
I talked with Mr. Ray about the heat treatment you propose to give the planting seed which you treat. He had no general information on the process, and advised that we would have to wait until the equipment was actually operating and then make a check to determine if the proper temperature and time requirements were met. If the seed can actually be brought to a temperature of 150 degrees for thirty seconds or to 145 degrees for a somewhat longer period then the treatment can be considered adequate. This applies to the drying temperature only.
The “heat treatment” to which this letter refers was the dryer technique. The same day, McLain advised Ray in El Paso that he had asked Mr. Feffer to notify him as soon as the equipment the dryer) was in operating condition so that it might be tested. Up to this point, neither Ray nor McLain had tested the equipment which was being readied as a pink bollworm control method. And thus far, the only representations which the record permits us to find were made to Mr. Feffer concerned: (i) The requirements of the state and federal regulations for the treatment of cottonseed infestation and (ii) the fact that the acid bath treatment would have to await Mr. Ray’s inspection and approval.
Before anything further was done by the United States inspectors, Mr. Feffer put cottonseed into the dryer, using the large burner to attain the heat necessary under the regulations. Seed was processed on January 2, 3, 5, and 6, 1953 (as well as later). Around that time, or perhaps a few days later, George Barron of the Arizona Crop Improvement Association came to the plant unexpectedly. He had not been notified prior to the processing of the seed, although the Delinting Co. should have given him notice; the Association *512 was tlie sole agency possessing authority to certify planting-seed in Arizona.[5] Mr. Barron smelled hot cottonseed which alerted him to the fact that something might be awry; he found the seed coming from the dryer to be “hotter than usual.” He took a sample of the delinted seed to the Arizona Seed Testing Laboratory that afternoon, and learned that the seed had already been tested, and revealed extremely low germination.
The first germination test of the cottonseed put through the Delinting Co.’s usual acid bath process with the addition of the larger burner, installed in December, involved seed delinted on January 3d. While the test takes twelve days to complete, intermediate readings are made on the fourth, fifth and sixth days; the first of such readings will tend to indicate whether the seed will germinate properly. The first intermediate reading on this cottonseed was made on January 7th and was probably available to Mr. Feffer on that date; the Trial Commissioner has found that Mr. Feffer learned of the poor germination of the processed seed “no later than January 9, 1953.” Finding 23. Despite this, more seed was processed on January 10th. The seed involved in this proceeding was run through the process on January 2, 3, 5, 6, 7, 9, and 10, 1953. Plaintiff and the Delinting Co. claim that all this cottonseed, some 250 tons, was destroyed and they suffered a loss.
It was not until January 6th or 7th that Mr. Kay (accompanied by Mr. McLain) visited the Delinting Co. for the first time material to this case. Mr. Kay approved the dryer, at that time, as a bollworm control measure based on the fact that it could heat the seed to a temperature of 150 degrees F. for an adequate period of time. This was determined by checking the temperature of the cottonseed after it left the dryer (allowing for cooling that might have occurred upon leaving the machine). Neither of the Government inspectors made any adjustment in the equipment. They prescribed no method or procedure for processing the seed, except the requirement that the seed must be heated *513 to a temperature of 150 degrees F. for not less than 30 seconds to eliminate pink bollworm infestation. Mr. Ray-refused to approve the acid bath technique by itself as a sterilization method because he was not familiar with the use of such a process for that purpose, although he had some general information about its use for delinting. The Department of Agriculture, up to then, had not approved the acid delinting technique as a pink bollworm sterilization measure.
The alleged negligent misrepresentation upon which plaintiff rests its case is the observation by Mr. Ray, on that visit, “that no harm could result from following his directions with respect to the application of heat to the cottonseed * * * and that he had tested seed for germination after he had heated it to 180 degrees F. for a period of 45 seconds, and * * * the only way the seed was affected was that such heat made the seed germinate ‘a little faster.’” Finding 19. Plaintiff asserts that 180 degree heat was excessive.[6] However, it should be noted that Mr. Feffer was cautioned that, with the particular dryer used by the Delinting Co., some seed might be heated excessively. Finding 20. See, also, footnote 4, suprai. Mr. McLain told Mr. Feffer to take steps to safeguard the viability of the seed in the dryer and to have germination tests run.
As we have pointed out, Mr. Feffer, after this meeting, further processed cottonseed without waiting for germination reports on the first batch of seed processed before Mr. Ray ever visited the plant. There is no direct proof as to what part of the procedure — the acid treatment or the drying — caused the loss of viability to the seed which is the subject of the claim. No one from the Arizona Commission of Agriculture and Horticulture or the U.S. Department of Agriculture was present when the cottonseed was run through. It is known, however, that excessive heat can destroy cottonseed. The Trial Commisisoner has accordingly found that excessive heat in the dryer caused the destruction of the seed since the acid bath technique had, *514 prior to the use of the larger burner, not produced that unfortunate result.[7]
On essentially the foregoing facts, the Trial Commissioner recommended these ultimate findings:
It is not established that Mr. Ray was negligent in refusing to approve the acid bath process as a pink boll-worm control on the occasion of his first visit [on January 6th or 7th] to the Delinting Company plant. It is found, however, that he was negligent and exercised poor judgment in insisting that heat found to be excessive, would not damage the seed. He testified that heat up to 180° F. could not damage the cottonseed.
Plaintiff and the Delinting Co. wholly embrace these conclusions, without comment of any kind. Defendant argues, on the contrary, that Mr. Ray, while he may have exercised poor judgment, could not have caused the damage to the seed. We think defendant’s view is correct.
No matter how gross an error Mr. Ray may have made, the Government cannot be held responsible, under any theory, unless harm followed as a result of his statements. Recovery is never permissible where the challenged conduct had no connection with, i.e., did not “cause,” the injury. And the facts show that Mr. Ray’s assurances as to 180 degree heat played no part, so far as we can tell, in the destruction of the viability of the cottonseed processed by the Delinting Co. in early January 1958. Mr. Feffer, acting for the Delinting Co., processed cottonseed on January 2d, 3d, and 5th before Mr. Ray had come to the plant, had approved the equipment, or had given any opinion as to whether seed would be harmed in the dryer. It is clear, therefore, that with respect to that seed Mr. Feffer could not possibly have relied on any representations (made on January 6th or 7th) by Mr. Ray. But that very seed (which, curiously, plaintiff includes in its present claim) was destroyed in exactly the same way as the later-processed seed. Since seed treated by the Delinting Co. prior to Mr. Ray’s appearance was harmed in the same way as seed processed thereafter, it cannot be *515 inferred that but for Ray’s statement the injury would not have occurred. If excessive heat was the cause of the destruction of viability, the Delinting Co. must have been using excessive heat before Ray appeared at the plant. There is no adequate showing that, before Ray’s visit, Mr. Feffer was suspicious of the amount of heat to which his process was subjecting the seed and that he relied upon Ray’s statement as to 180 degree heat as warrant for continuing the total heat he had previously been using. There is likewise no adequate showing that Mr. Feffer allowed Ray’s observation about 180 degree heat to lull him into quiescent acceptance of the amount of heat engendered by the Delinting Co.’s process.[8] Had Mr. Feffer merely run off small quantities of seed on January 2d, 3d and 5th in order to produce samples for germination tests, and had only increased his plant’s activity after Ray’s inspection, in reliance on what the Government inspector said, this case might be on a different footing. The record shows, however, that cottonseed was fully processed for the normal course of business both before and after the inspection. There is no sufficient reason to believe that Mr. Feffer, having already begun processing substantial amounts of cottonseed on his own, would not have continued to do so absent Mr. Ray’s opinions. He even continued plant activity with regard to infested seed on January 10th despite his knowledge of the extremely poor germination reports acquired “no later than January 9,1953.”
In addition, there is also a serious issue whether Mr. Feffer, if he did rely on Mr. Ray’s statements, properly interpreted those representations. Ray’s assurances simply amounted to the view that cottonseed heated to a temperature of 150 to 180 degrees F. for 45 seconds would not be hurt in its germinating characteristics; the test of the equipment was for the purpose of determining whether it would be able to meet the standards of the state and federal regulations with respect to the heating standard. At the same time, Mr. Feffer was cautioned that the Delinting Co. dryer was of *516 the kind that might produce more heat for seed closer to the wall and that something ought to be done to safeguard the viability of the seed. It was also made explicit that germination tests should be made. Together, these statements do not add up to a green light to go ahead pell mell without prudence. Mr. Feffer had no right to rely on one statement of the inspectors without also considering the other things they said. There is nothing in the record to show that Mr. Feffer made any adjustment in the dryer to see that seed closer to the wall was not subjected to excessive heat, in accordance with the warning that he do so. It might very well have been that factor which caused the processed cottonseed in this suit to have extremely poor germinating qualities. Contrary to the advice given, Mr. Feffer also went ahead without waiting for or heeding the results of the germination tests.
The most liberal interpretation of an “equitable” claim in a Congressional reference would not suggest recovery against the United States unless the fault of the Government contributed materially to the loss. We find no such contribution here. Our holding on the entire suit is that neither plaintiff nor the Delinting Co. has a legal or an equitable claim against the United States.
This opinion and the findings of fact incorporated herein will be certified by the Clerk to the Senate pursuant to Senate Resolution No. 140, 86th Congress, 2d Session.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Paul H. McMurray, and the 'brief and argument of defendant’s counsel, makes findings of fact as follows:
1. At all times material to this case, plaintiff Ralph Feffer and Sons was a partnership, comprised of Ralph B. Feffer, Sr., Ralph B. Feffer, Jr., and Robert E. Feffer. Ralph Feffer and Sons claims no loss in connection with the events involved in this case; the claim filed here is made on behalf of Delinting and Seed Treating Company of Phoenix, Arizona, a corporation of which Ralph B. Feffer, Sr., was and is the *517 president, and was, at the time the events resulting in this claim occurred, the owner of 50 percent of the stock.[9]
2. The petition was filed by plaintiff pursuant to Senate Resolution No. 140, 86th Cong., 2d Sess., which referred Senate Bill 2243, a Bill for the Relief of Ralph Feffer and Sons, to the Court of Claims for a report to the Senate:
* * * giving such findings of fact and conclusions thereon as shall be sufficient to inform the Congress of the nature and character of the demand as a claim, legal or equitable, against the United States and the amount, if any, legally or equitably due from the United States to the claimant.
The claim is for damages to cottonseed intended for planting, the viability of which was allegedly destroyed as the result of negligence on the part of a Department of Agriculture inspector who gave instructions for heat treatment of the cottonseed to at least 150° F. for a period of 30 to 45 seconds for elimination of pink bollworm infestation.
3. The events upon which the claim is based occurred in 1952 and 1953, more than 6 years prior to June 24, 1959, on which date Senate Bill 2243 was introduced, and September 3, 1960, on which date suit was filed in this court.
4. The Delinting and Seed Treating Company (hereafter referred to as the Delinting Company) and its predecessor have been, since 1937 or 1938, engaged in the business of delinting, or removing the lint or fuzz from cottonseed by the use of sulphuric acid, to improve the planting and germinating characteristics of cottonseed.[10]
Prior to January 1953, no cottonseed processed by the Delinting Company had ever been rendered nonviable as a result of the delinting process used.
5. The acid bath process was developed by the Delinting Company in 1944. The technique is a trade secret. In utilizing the acid delinting process, fuzzy or undelinted *518 cottonseed is poured into a screw conveyor or feeder unit, which carries the seed into an acid bath of some 93 to 98 percent sulphuric acid, which dissolves the lint and removes all of it from the cottonseed. The cottonseed is moved through the acid bath by means of a conveyor, and then carried to a water bath where large quantities of cold water wash off the sulphuric acid. The delinted and washed cottonseed is then moved by a conveyor belt to a drying unit, which removes the moisture from the seed. After the drying process is completed, the seed is moved to another unit, where a poisonous chemical seed protector is added. The seed is then moved to a sacking box, where it is poured into bags holding from 70 to 80 pounds of delinted seed. Samples of the delinted seed are collected at the sacking box to be used for seed-germination tests. These samples represent 500 80-pound bags, or 20 tons of delinted cottonseed. Samples are also collected from the fuzzy seed, prior to delinting, if the owner of the cottonseed wishes to obtain germination tests before the seed is delinted. Reports on the germination tests on fuzzy seed do not come back to the Delinting Company, but when customers make requests to have their seed delinted, the company assumes that the germination reports on the fuzzy seed have been satisfactory to a degree which warrants utilization of the delinting process.
6. The Delinting Company purchased a new dryer for the 1952-53 delinting season, which was installed in late September or early October of 1952. The dryer was a square vertical tower with both the outer and inner walls made of a perforated metal mesh material. The dryer contained no paddles or conveyors and the seed fell down by gravity between the inner and outer walls of the dryer as the hot air which heated the seed traveled up the hollow center portion of the unit. The dryer had a thermometer in the center air stack which recorded the temperature of the air, but not the temperature of the seed. The seed remained in the dryer from 18 to 20 minutes, and could remain as long as 25 minutes. The seed did not fall evenly through the dryer; some seed might fall through in 5 minutes and other remain in the dryer for 30 minutes. The Arizona Cotton Planting Seed Distributors, a nonprofit organization of cotton farmers which ban *519 died most of tbe cottonseed processed by the Delinting Company, was concerned about the new, untried piece of equipment, but, since no seed had ever been damaged by that company, it permitted the Delinting Company to continue delinting its cottonseed that season.
7. The TJ.S. Department of Agriculture, acting under the Plant Quarantine Act of 1912, as amended, has authority to quarantine an entire state and to regulate the movement of infested plants and plant products in interstate commerce. The Department of Agriculture cooperates with state agencies to control movement of plants and plant products from infested areas within a state into free or noninfested areas of such state.
8. Prior to December of 1952 only three counties of the State of Arizona (Cochise, Greenlee, and Graham) were under qaurantine for pink bollworm. However, on December 11, 1952, gin trash collected from a cotton gin at Sahu-arita in Pima County, Arizona, was examined by the use of a gin trash machine. A single pink bollworm was discovered. Because pink bollworms multiply rapidly, this discovery was of great significance as it could mean that there were many bollworms in the cotton fields of Pima County.
9. After the discovery of pink bollworm in Pima County, the Arizona Commission of Agriculture and Horticulture held a conference in the office of the State Entomologist on December 17, 1952, at which certain steps were agreed upon for the control and eradication of the newly discovered infestation. Mr. George B. Eay of the U.S. Department of Agriculture attended the conference.
Mr. Eay was the area inspector in charge of Area 1 of the Pink Bollworm Control Project of the Bureau of Entomology and Plant Quarantine. Mr. Eay’s headquarters were in El Paso, Texas, and Area 1 included West Texas, New Mexico, and Arizona.
10. Sometime in December of 1952, Mr. Ealph B. Feffer, Sr. (hereafter referred to as Mr. Feffer), learned about the discovery of pink bollworm in Pima County, Arizona, and was advised by the County Extension Entomologist that some cottonseed from the infested area had been shipped to the Delinting Company and that such cottonseed would have to *520 be sterilized or fumigated before it could be moved from the delinting plant. Both state and Federal regulations for sterilizing or treating cottonseed for pink bollworm required that the seed be heated to a temperature of 150° F. for a period of at least 30 seconds or be fumigated with methyl bromide.
11. Shortly thereafter, in the latter part of December 1952, Mr. George McLain, Mr. Ray’s subordinate and an inspector for the Department of Agriculture, visited the Delinting Company plant. This was the first visit by anyone from the TJ.S. Department of Agriculture which is material to this case. Mr. Feffer discussed his acid bath sterilization process, developed in 1944 and used since that date, with Mr. McLain. Mr. McLain told Mr. Feffer that he could not approve or disapprove any equipment or process in the Delinting Company plant as a pink bollworm sterilization method, but that his superior, Mr. Ray, would have to approve or reject it.
12. The record is not entirely clear whether it was before or after this meeting with Mr. McLain that Mr. Feffer ordered a larger burner for the drying unit used with the acid bath process. Neither Mr. McLain nor Mr. Ray (who had not yet at this time visited the Delinting Company plant) specifically ordered or required the purchase of a larger burner. The new burner was ordered on December 22, or 23, 1952, and was installed at the Delinting Company plant prior to December 30,1952.
13. It is reasonable, however, to conclude that the new burner was purchased because Mr. Feffer believed it was necessary in order to have the dryer approved as a pink boll-worm sterilizer. The purchase appears to have been the outcome of Mr. Feffer’s learning, from Mr. McLain, of the state and Federal regulations requiring that infested cottonseed be heated to a temperature of 150° F., taken together with Mr. Feffer’s own belief that the previously used smaller burner could not provide enough heat to meet the standard of the regulations.
14. On December 30,1952, Mr. McLain wrote to Mr. Fef-fer, in part, as follows;
*521 I talked with Mr. Kay about the heat treatment you propose to give the planting seed which you treat. He had no general information on the process, and advised that we would have to wait until the equipment was actually operating and then make a check to determine if the proper temperature and time requirements were met. If the seed can actually be brought to a temperature of 150 degrees for thirty seconds or to 145 degrees for a somewhat longer period then the treatment can be considered adequate. This applies to the drying temperature only.
The “heat treatment” discussed in the letter referred to the drying unit. That same day and the following day, McLain advised Mr. Bay in El Paso that he had asked Mr. Feffer to notify him as soon as the new equipment was ready to operate and that he would then visit the delinting plant and test the equipment. Mr. McLain testified that he might have seen the new equipment which was being or had been installed, but since it had to be approved by Mr. Kay “there was no purpose in my checking it.”
15. As of December 30, 1952, Mr. Kay had not visited the Delinting Company plant, and he was not familiar with the new tower dryer installed for the 1952-53 delinting season, nor with the plant’s other equipment or process.
16. On Friday and Saturday, January 2 and 3, 1953, the Delinting Company delinted some cottonseed belonging to W. H. Lane and Producers Cotton Oil Company, which is a part of the cottonseed involved in the claim in this case. The company also delinted other cottonseed which .is a part of the seed involved in the claim in this case on the following Monday and Tuesday, J anuary 5 and 6, 1953.
17. On Monday, January 5,1953, Mr. Kay drove from El Paso to Arizona, and either picked up Mr. McLain in Saf-ford, Arizona, or joined him later in Phoenix. On either J anuary 6 or 7, 1953, Mr. Ray and Mr. McLain visited the Delinting Company plant in Phoenix to inspect the company’s equipment to see if it could be approved for pink bollworm sterilization. Earlier, by telephone, Mr. Feffer had requested that Mr. Kay approve the company’s dryer for pink bollworm control.
18. When Mr. Ray came to the Delinting Company plant in early January 1953, Mr. Feffer explained to him that the *522 seed could be sterilized in the acid bath and asked that he approve the acid delinting process alone as a pink bollworm control. Mr. Ray, according to Mr. Feffer, “refused to look at it, refused to accept it, and * * * insisted that we had to have 150 degrees temperature within the chamber where this seed was held in the drier moving downward, it had to be 150 degrees. * * *” Mr. Ray did not check the acid delinting process as a pink bollworm control unit. He was generally familiar with the acid delinting process, but was not familiar with the use of such process as a method for pink bollworm control. As of that time, the Department of Agriculture had never approved the acid delinting process as a pink bollworm control measure, and this may explain Mr. Ray’s apparent lack of interest in the subject.
19. While at the Delinting Company plant in early January 1953, Messrs. Ray and McLain checked the temperature of the seed at a point near the exit of the dryer. The first check revealed the actual seed temperature to be somewhat lower than required. Thereafter the burner, or heat source, was adjusted by Mr. Feffer or one of his employees and further checks were made showing seed temperature to be as high as 151°. Based upon the checks made with a hand thermometer at the nearest point at which a sufficient amount of the seed accumulated after leaving the dryer, and making an allowance for some cooling which occurred after leaving the dryer, Messrs. Ray and McLain determined that the seed was being adequately heated, and that the dryer had excess capacity to take care of atmospheric changes.
Mr. Ray approved the dryer as a pink bollworm control measure based on the fact that it could heat the seed to a temperature of 150° F. for an adequate period of time. Neither Mr. Ray nor Mr. McLain made any adjustment in the equipment in the plant. They were not aware of how the equipment was adjusted when they left the plant and they prescribed no method or procedure for processing the cottonseed, except the requirement that the seed must be heated to a temperature of 150° F. for not less than 30 seconds to eliminate pink bollworm infestation. It was Mr. Ray’s opinion, clearly and unequivocally stated to Mr. Fef- *523 fer and repeated as a witness at the trial, that no harm could result from following his directions with respect to the application of heat to the cottonseed. He also stated that he had tested seed for germination after he had heated it to 180° F. for a period of 45 seconds, and he expressed the opinion that the only way the seed was affected was that such heat made the seed germinate “a little faster.”
20. At the time of the visit described above, Mr. Feffer was either aware of or was warned by Mr. McLain that, because of the nature of that particular dryer, seed closer to the wall of the dryer might receive more heat than other seed. Mr. McLain also cautioned Mr. Feffer to take steps to safeguard the viability of the seed, and to have seed germination tests run. Mr. Feffer advised him that that was done routinely in that plant. Mr. Ray testified that he did not advise Mr. Feffer to run a small quantity of seed first and check the germination results because he (Ray) “thought any man that was delinting or treating cottonseed would do that as a matter of his own protection.”
21. Mr. Feffer has had a great deal of experience in delinting cottonseed and was greatly concerned about the instructions as to the 150° F. heat given him by Mr. Ray with respect to heating the seed. He told Ray that he “was afraid of that much heat, that it would damage the seed.” However, for economic reasons, and to accommodate a customer, he went ahead against his own judgment and processed large amounts of cottonseed without waiting for germination reports on the first batch of seed which was sterilized for pink bollworm in the drying unit.
22. No one from the Arizona Commission of Agriculture and Horticulture or the U.S. Department of Agriculture was present in the Delinting Company plant when the cottonseed involved in this claim was processed. Cottonseed involved in this claim, in addition to that which was delinted on January 2, 3, 5, and 6, 1953, was delinted on January 7, 9, and 10,1953.
Sometime during this early period in January 1953, Mr. George Barron of the Arizona Crop Improvement Association visited the Delinting Company plant. The plant was in operation when Barron arrived. He had not been noti- *524 fled prior to the processing of cottonseed. Such notice was in order and should have been given Barron since the Association was the sole agency possessing authority to certify planting seed in Arizona. Barron’s duties required him to visit processing plants, check operations, and maintain controls for the proper marking and protection of the purity of planting seed. When Mr. Barron entered the Delinting Company plant, he smelled hot cottonseed, which caused him to think that something was wrong, and, upon checking seed coming from the dryer, he found it was “hotter than usual.” He took a sample of the delinted seed to the Arizona Seed Testing Laboratory that afternoon, and learned that the seed had already been tested, and revealed extremely low germination.
23. The first germination report of seed involved in this claim, of which there is any record in the case, relates to seed delinted on January 3, 1953. The germination test for that seed was started on the same day it was delinted. The germination test takes 12 days, but intermediate readings are made on the fourth, fifth, and sixth days; and the first reading will tend to indicate whether the seed will germinate properly. As soon as the first intermediate reading reflecting poor germination quality was made, the Arizona Seed Laboratory advised Mr. Feffer or the Arizona Cotton Planting Seed Distributors of that fact. As soon as the Arizona Cotton Planting Seed Distributors learned of the unsatisfactory germination reports, the manager of that organization advised the Delinting Company to stop delinting the organization’s cottonseed. The Arizona State Entomologist also advised Mr. Feffer about the unsatisfactory germination reports, although Mr. Feffer had learned of them no later than January 9,1953.
24. The germination tests did not show why the cottonseed failed to germinate, but just the fact that it did not germinate properly. Excessive heat can adversely affect the germination of cottonseed, and it is a reasonable conclusion, based on all the evidence presented, that excessive heat caused the destruction of the viability of the cottonseed involved in this claim. Since the new dryer was the only change in the delinting process for the 1952-53 season, it *525 seems apparent that the excessive heat which damaged the seed was generated during the time the seed was in the dryer. After the 1952-53 delinting season, the Delinting Company purchased a new dryer, which dried the seed in 3 minutes.[11]
25. The State Entomologist informed Mr. Ray, on January 9, 1953 — the day after Ray returned to El Paso from his inspection of the Delinting Company plant — about the poor germination results. Ray instructed Mr. McLain to go to the Delinting Company plant in Phoenix and attempt to determine the cause of the poor germination and to correct it.
26. Mr. Ray approved the acid bath process of the Delinting Company as a pink bollworm treatment by letter sent to Mr. Feffer, dated January 15,1953, as follows:
In accordance with our recent conversation you are advised that the acid delinting process arranged and tested by you and Mr. McLain for the purpose of treating planting cotton seed originating in the newly infested areas of Pima and Santa Cruz Counties, Arizona, is hereby approved.
This approval is predicated on the fact that all cotton seed you receive from the abo've designated areas will be heated to 150 degrees F. for a period of not less than 30 seconds as a continuous process of delinting.
We both realize the importance of using every precaution to safeguard viability of the planting seed involved so if you will be kind enough to notify me three or four days in advance of your starting time I will assign an inspector to take periodic temperature checks of the seed during the delinting process. We trust that you have had sufficient tests made using seed delinted by the approved process to be certain the germinating qualities will not be impaired. As there is only a slight change from your normal delinting process it appears to me that no injury should occur.
The heating of cottonseed in the acid bath to the temperature of 150° F. for a minimum of 30 seconds was a suitable and effective method of sterilizing cottonseed and killing any existing pink bollworm infestation. Because the acid bath process *526 was a trade secret, it bad, before this, been, unknown to Mr. Nay and Mr. McLain that during the month of December 1952 and the early part of January 1953, the temperature of the cottonseed in the acid bath was raised to a minimum of 150° F. for 30 to 40 seconds.
27. On January 26, 1953, Mr. McLain inquired of Mr. Feffer as to when he expected to be delinting the seed from the Sahuarita area, this being the bulk of the seed which came from the infested areas and which had to be treated for pink bollworm. Sometime in February 1953, the Delinting Company delinted that seed, under the supervision of Mr. McLain. No claim is made in connection with any of the seed which was processed under Mr. McLain’s supervision.
28. No claim was made to the Department of Agriculture in connection with the loss set out in plaintiff’s petition until March of 1955.[12]
29. The record does not warrant a finding that the loss incurred by the Delinting Company in connection with seed damaged in January 1953 exceeds the amount of $19,873.31.[13]
30. It is not established that Mr. Nay was negligent in refusing to approve the acid bath process as a pink bollworm control on the occasion of his first visit to the Delinting Company plant, or in approving the dryer for pink bollworm treatment.
31. It is indisputable that Mr. Feffer could not have relied on Mr. Nay’s statement about 180'° F. heat with respect to the cottonseed processed on January 2,3, and 5,1953, and it is not established that Mr. Feffer relied on that statement with respect to the cottonseed processed on January 6', 7, 9, and 10,1953.
32. It is not established that the statement by Mr. Nay as to 180° F. heat caused any loss or damage to the cottonseed.

 Since the reference was made and the testimony concluded prior to the Supreme Court’s ruling in Glidden Co. v. Zdanok, 370 U.S. 530 (1962), we think it proper to file this report without reference to the Supreme Court’s opinions. Defendant’s belated attack on the jurisdiction of this court is, therefore, rejected.

 The corporation has been joined as a third-party plaintiff and, in, this opinion, will be called the Delinting Co. The term “plaintiff” will be used solely with respect to the partnership.

 In general terms, the process involves four steps: tlie cottonseed is carried by conveyor to a sulphuric acid bath in which it is immersed and the fuzz burned off by the action of the acid; the seed is then washed in cold water to remove the caustic agent; in the next operation, the seed continues to a low-heat drying unit where the moisture is removed; and, finally, a chemical seed protector is added.

 The device was in the form of a square, vertical tower with the outer and inner walls made of a perforated metal mesh material. It contained no paddles or conveyors to control the flow of seed; the seed merely fell, by gravity, between the inner and outer walls of the dryer as hot air, which heated the seed, traveled up the hollow center portion of the unit. There was a thermometer in the center air stack which recorded the temperature of the air, but not the temperature of the seed. The seed could remain in the dryer for 18 to 20 minutes and sometimes longer. The seed did not fall evenly through the machine; some seed might fall in five minutes while other seed might remain in the dryer for a full half-hour.

 Mr. Barron was empowered to check operations at seed processing plants and maintain controls for the proper marking and protection of the purity of planting seed.

 The governmental regulations declared that 150 degrees would be enough for sterilization.

 On January 15, 1953, Mr. Ray aid approve the acid bath system as a means of eradicating pink bollworm infestation. Seed was processed under that technique, under the supervision of Mr. McLain in February 1953, and no claim is made as to that seed.

 In Finding 21, we report that Mr. Feffer was concerned even about 150 degree heat (the level required by the state and federal regulations), but nevertheless went ahead for economic reasons and to accommodate a customer. As stated in the text, there is no sufficient proof that he relied on Ray’s statement about 180 degree heat.

 The 1952 and 1953 Federal Income tax returns of Delinting and Seed Treating Company reflect stock ownership as follows: Ralph B. Feffer, Sr., 50 percent; Ralph B. Feffer, Jr., 25 percent; Robert E. Feffer, 25 percent. The 1954 tax return of that company shows that Ralph B. Feffer, Sr., and Ralph B. Feffer, Jr., each owned 33% percent of the stock.

 federal income tax returns of the Delinting Company state that the company was incorporated in 1938.

 Defendant does not challenge the manner In which the seed was damaged, but merely whether or not Mr. Ray’s instructions were the cause of the seed damage. Although two witnesses, Mr. Wuertz and Mr. Barron, blamed the dryer for the excessive heat, neither of them had any detailed knowledge about the dryer.

 Both Mr. Feffer and Mr. Ray testified concerning conversations which they had in February of 1963 about the loss. Mr. Ray stated that he told Mr. Feffer that he (Ray) had no authority to pay damages, and that Mr. Feffer would have to go to a higher level.

 The Delinting Company reported a loss of $19,873.31 on its Federal income tax return for 1953. This was listed as “allowances for damaged seed.” The only loss reflected in the company’s original books and records is the amount of $19,873.31, which was an entry posted to an account captioned “Miscellaneous Losses and Costs” in the general ledger, account c-405. The heading over the column to which it was posted was “Damaged Seed, April 1944 through December 81, 1953.”