**MENOMINEE INDIAN TRIBE OF WISCONSIN, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**Cong. Ref. No. 93–649X.**

United States Court of Federal Claims.

Oct. 30, 1997.

Charles A. Hobbs, Hobbs, Straus, Dean & Walker, Washington, DC, attorney of record for plaintiff. Jerry C. Straus, Frances L. Horn, Marsha Kostura Schmidt, and Joseph H. Webster, Washington, DC, of counsel.

Glen R. Goodsell, U.S. Dept. of Justice, General Litigation Section, Environment and Natural Resources Div., Washington, DC, attorney of record for defendant.

## OPINION

BRUGGINK, Hearing Officer.

This is a congressional reference arising from the relationship between the United States Government and the Menominee Indian Tribe. It was referred to the court in 1993. The dispute it embodies has been the subject of prior litigation in our predecessor courts. That litigation, involving claims by the Menominee Indian Tribe of Wisconsin ("Tribe" or "Menominee" or "plaintiff") on substantially the same facts and claims at issue herein, was decided against the Tribe. The question now put by the Senate to the court, acting in its unique capacity of advising Congress on proposed legislation, is whether the damages referred to in the following proposed legislation, if adopted, would constitute payment of a legal or equitable claim or a gratuity:

Section 1. The Secretary of the Treasury is authorized and directed to pay to the Menominee Indian Tribe of Wisconsin ... a sum equal to the damages sustained by ... reason of—

(a) the enactment and implementation of the Act of June 17, 1954 (68 Stat. 250), as amended and

(b) the mismanagement by the United States of Menominee assets held in trust by the United States prior to April 30, 1961, the effective date of termination of

Federal supervision of the Menominee Indian Tribe of Wisconsin.

S. 1335, 103d Cong. (1993).

Subsection 1(a) of the proposed legislation refers to the Menominee Termination Act of 1954 ("Termination Act"). This legislation terminated federal supervision over and responsibility for the property and members of the Tribe. It was enacted in 1954 and was fully implemented in 1961. The claims implicit in the current reference bill were made in the prior litigation and were ultimately resolved against the Tribe.

Presently pending are the parties' cross motions for summary judgment[1] on the first three counts out of a total of twelve counts of plaintiff's complaint. Count I is a claim based on a breach of fiduciary duty by the Government. The Tribe contends that Congress, by passing a statute to end federal supervision of the Menominee when the Tribe was not prepared to care for itself, breached a fiduciary duty and caused damage to the Tribe. Count II is a claim based on mismanagement of the tribal forest. Count III is a claim based on mismanagement of the Tribe's sawmill. The Government contends that payment to the Tribe cannot be based on the passage of the Termination Act because an act of Congress cannot be a breach of trust. To the extent that Counts II and III are not based on the Termination Act, the Government contends that they are barred by the statute of limitations and that no good reason exists to excuse the untimeliness of those claims.

## PROCEDURAL HISTORY

In 1947 the Senate Committee on Civil Service conducted an investigation on ways to reduce the number of employees needed by the Bureau of Indian Affairs (BIA). One suggestion was that the BIA gradually withdraw from control over Indian affairs. The Menominee were one of the first tribes considered for the cessation of government control, and on June 17, 1954, the Menominee Termination Act became law. *See* 25 U.S.C.

§§ 891–902 (1970) (repealed 1973). Final termination of federal supervision was accomplished by proclamation of the Secretary of the Interior on April 29, 1961. *See* 26 Fed.Reg. 3726 (1961). As part of the termination process, the Government deeded the Menominee forest to the Tribe. In 1973 the Menominee were returned to federal supervision. *See* Menominee Restoration Act, 25 U.S.C. §§ 903–903f (1994). The Menominee sued the United States in 1967 in the U.S. Court of Claims with the results set out below.

### A. *Basic Case*

In the first count, the Menominee claimed that the Government, acting through Congress, had breached its fiduciary duty by terminating control over the Tribe. Trial Judge Spector agreed. *See Menominee Tribe of Indians v. United States,* No. 134–67, slip op., at 43 (Ct.Cl. July 19, 1978) (trial decision). He held that a trust relationship had existed between the Menominee and the Government. He ruled that a trustee has a duty to resist termination of the relationship when it is not in the best interests of the beneficiary to do so and that termination here was inappropriate at the time it was implemented. He therefore found that enactment and implementation of the Termination Act constituted a breach of trust on the part of the United States, acting through Congress. This part of the litigation has come to be known as "Menominee Basic" or "Basic." No particular money damages were found but were to be addressed in future trials. The appellate branch of the U.S. Court of Claims reversed. *See Menominee Tribe of Indians v. United States,* 221 Ct.Cl. 506, 607 F.2d 1335 (1979) (*Menominee Basic*). It assumed, arguendo, that a trust relationship existed between the Government and the Tribe, but went on to hold that there was no jurisdiction to entertain a suit based on the claim that a constitutional statute is a breach of trust owed by the Government to

---

1. In resolving the pending motions, the court has been given no real option by the Government but to treat as undisputed virtually all of the original fact findings of Trial Judge Spector, as well as

the supplemental fact findings more recently proposed by plaintiff. Accordingly, those fact findings form the record herein.

the Indians. *See Menominee Basic,* 221 Ct. Cl. at 519–20, 607 F.2d at 1343–44.

### B. *Deed Restrictions*

In the second count, the Menominee sought damages arising from restrictions placed in the 1961 deed of conveyance from the Government to the tribal corporation for the Menominee forest. The deed restricted the Tribe to protecting the Menominee forest on a substantial-yield basis and contained a thirty–year restraint on alienation. Trial Judge Spector held that these restrictions were either a breach of fiduciary duty or a taking. He awarded damages of $29,300,000. *See Menominee Tribe of Indians v. United States,* No. 134–67–A, slip op., at 73 (Ct.Cl. Mar. 22, 1979).

The appellate division granted the Tribe's motion to remand the Deed Restriction count to the trial judge for reconsideration of his opinion, findings, and conclusion in light of the outcome of the appeal in *Menominee Basic. See Menominee Tribe of Indians v. United States,* 224 Ct.Cl. 688, 689, 1980 WL 13225 (1980). On remand, Trial Judge Spector reaffirmed his earlier decision, eliminating any reference to the enactment of the Termination Act as a breach of trust by Congress, and again awarded damages of $29,300,000. *See Menominee Tribe of Indians v. United States,* No. 134–67–A (Ct.Cl. Dec. 31, 1980).

That decision was appealed by the Government to the newly formed Federal Circuit, which reversed and ordered dismissal of the claim. It held that the lower court had not correctly applied *Menominee Basic. See Menominee Tribe of Indians v. United States,* 726 F.2d 712 (Fed.Cir.1983). The deed restrictions were implemented as part of the Termination Act. Therefore, no justiciable claim for breach of trust could arise. The Fifth Amendment taking claim was reversed because the court held that the deed restrictions constituted permissible regulation. *See id.* at 717.

### C. *Forest Mismanagement*

In the third count, the Menominee claimed that the Government, acting through the BIA, breached its fiduciary duty to the Tribe by mismanaging the Menominee forest between 1951 and 1961. Trial Judge Spector agreed. Damages were set at $4,317,500 for the period of mismanagement before the Termination Act and $2,878,415 for the post-termination period as a result of the pre-termination mismanagement. *See Menominee Tribe of Indians v. United States,* No. 134–67–B (Ct.Cl. Apr. 4, 1980). Trial Judge Spector rejected the alternative Fifth Amendment taking basis of this claim.

The Government argued that the Forest Mismanagement claim was untimely. It contended that the cause of action arose on either April 26, 1961, the day the Secretary of the Interior transferred the Menominee forest by deed to the tribal corporation, or April 30, 1961, the day of termination of federal control and supervision. The suit was filed on April 25, 1967. At most, the claim was only timely for any mismanagement that took place during the five-day period between April 25, 1961, and April 30, 1961. After April 30, 1961, the Government no longer controlled the land so it could not have mismanaged it. Any acts of mismanagement prior to April 25, 1961, would have been beyond the six-year limitations period for bringing actions in the U.S. Court of Claims.

Trial Judge Spector agreed that the claim appeared to be stale. However, he found that the claims were "inherently unknowable" by the plaintiffs. He rejected the Government's argument that the Tribe's claims were knowable at least by the time of publication of the 1961 Management Plan, which was called for under the Termination Act in order to plan for tribal control of property and services that the Government had controlled prior to termination. Judge Spector ruled alternatively that even if the Tribe had access to the plan prior to Termination, there was no evidence that the plan alone would have made the Tribe aware of the forest mismanagement or of the consequences the mismanagement could have. *See id.*

The Federal Circuit reversed, holding that the pre-termination part of the claim was barred by the statute of limitations. *See Menominee Tribe of Indians v. United*

*States,* 726 F.2d 718 (Fed.Cir.1984) (*Menominee II*). First, the running of the limitations period was not tolled by the Indians' ignorance of their legal rights. Second, the facts were not concealed or "inherently unknowable." The Federal Circuit considered facts such as the Tribe's successful lobbying of Congress for an increase in the statutory harvest limitation in 1956, its settlement of a suit against the Government for mismanagement for a substantial amount, and from 1954 onward the Tribe's active participation in the congressional consideration of termination and in preparation of the termination plan as indicative of a failure to establish grounds to toll the limitations period. *See id.* at 720–22.

The Federal Circuit also rejected the alternative theory that a breach-of-trust claim did not accrue until termination. *See id.* at 723. This theory only applies, it held, when the Government has already appropriated money for an individual or group and holds that money in trust until it is claimed. *See id.* A cause of action based on the money held in trust does not accrue until a request for payment is rejected. In this case, because the Tribe never had a recognized right to a particular sum of money, the mismanagement claim accrued at the time the acts were completed. In other words, the Forest Mismanagement claim began accruing sometime after 1951, the last period covered by the earlier litigation.

D. *Sawmill Claim*

In the fourth count, the Tribe claimed that the Government had mismanaged the Menominee sawmill. Trial Judge Spector agreed and held this constituted a breach of the Government's fiduciary duty. *See Me-*

nominee Tribe of Indians v. United States, No. 134–67–C (Ct.Cl. Aug. 14, 1980). He held that the statute of limitations had not run because the tribal members were not on notice of mismanagement. Damages for mill mismanagement prior to the termination of the trust relationship were found to be $2,163,769. Damages occurring after the termination as a result of mismanagement prior to the termination amounted to $3,305,767. On November 16, 1984, pursuant to an order from the Federal Circuit, the trial court vacated its earlier opinion and dismissed the Mill Mismanagement count.[2]

E. *Other Claims*

In the fifth count, the Menominee claimed the Government had taken land for highway rights of way without payment. Trial Judge Spector agreed and held the Government liable for the fair market value of land actually taken. Damages were to be determined by the parties. Plaintiff later moved to dismiss this count because research revealed that any damages would be minimal. *See Menominee Tribe of Indians v. United States,* No. 134–67–D (Ct.Cl. Jan. 27, 1981).

In the sixth count, the Menominee claimed the Government was responsible for termination expenses under a Fifth Amendment taking theory or, in the alternative, as a breach of fiduciary duty. Trial Judge Spector held that the fiduciary-duty claim was beyond the jurisdiction of the court and that the taking claim was unsupported by the facts. He also held, however, that the Menominee were entitled to reimbursement pursuant to section six of the Termination Act of any covered termination expenses that had not been paid.[3] On the basis of that opinion,

---

**2.** This order was the product of an unopposed motion to dismiss all counts other than the Basic, Deed Restriction, and Forest Mismanagement counts. The motion was filed by the defendant and was based on lack of jurisdiction for any damages stemming from the Termination Act and because of the passage of the limitations period. The motion was filed because the Supreme Court denied the Tribe's petition for a writ of certiorari in the Deed Restrictions and Forest Mismanagement cases. *See Menominee Tribe of Indians v. United States,* 445 U.S. 950, 100 S.Ct. 1599, 63 L.Ed.2d 786 (1980) (table) (denying certiorari). Because the limitations question was raised in the remaining counts and

because the question would be decided on similar facts, plaintiff did not oppose the motion.

**3.** Section six of the Termination Act allowed the Tribe to use its own funds, subject to approval by the Secretary of the Interior, for expert studies and reports but not other termination expenses. An amendment in 1956 provided federal funds for the expert studies and reports or for any other expenditure approved by the Secretary for the purposes of the Termination Act. In 1958 another amendment limited funds to expert reports and studies only. It also limited the amount that could be spent on such reports after July 2, 1958, to half of the expenditures incurred

the claim was settled for $15,000. *See Menominee Tribe of Indians v. United States*, No. 134–67–E (Ct.Cl. May 27, 1981).

In the seventh count, the Tribe claimed that the termination of its tax exempt status through the passage of the Act was a breach of fiduciary duty and a Fifth Amendment taking. The U.S. Court of Claims granted defendant's motion for summary judgment. The claim could not be based upon the Termination Act because of the ruling in *Menominee Basic*, and the taking theory was time-barred. *See Menominee Tribe of Indians v. United States*, 223 Ct.Cl. 662, 663–64, 1980 WL 99728 (1980) (order).

In the eighth count, the Menominee claimed the Government owed damages for granting two power-line rights of way to Wisconsin Power and Light Company. Trial Judge Spector held the grants were a breach of fiduciary duty and a Fifth Amendment taking. *See Menominee Tribe of Indians v. United States*, No. 134–67–G (Ct. Cl. June 5, 1981). On November 16, 1984, pursuant to an order from the Federal Circuit, the trial court vacated its earlier opinion and dismissed this count because of the prior ruling on the Basic and Deed Restrictions counts.

In the ninth count, the Menominee claimed the Government breached its fiduciary duty by failing to maintain an adequate water and sewage system. Trial Judge Spector agreed. *See Menominee Tribe of Indians v. United States*, No. 134–67–H (Ct.Cl. Aug. 4, 1981). On November 16, 1984, pursuant to an order from the Federal Circuit, he vacated his earlier opinion and dismissed the Water and Sewage System count. Plaintiff did not resist the motion to dismiss because it was apparent that the appeals court would dismiss the count on the grounds that it was not timely filed. The tenth count, in which the Tribe sought an accounting from the Government, was dismissed with prejudice for the same reason.

### F. The Congressional Reference

On July 30, 1993, the U.S. Senate adopted Senate Resolution 137, which refers Senate Bill 1335 to the Chief Judge of this court. On February 16, 1994, the plaintiff filed a complaint, consisting of twelve counts. Although some new counts were added, the theories of liability largely track the original action: I. breach of trust; II. forest mismanagement; III. mill mismanagement; IV. loss of tax exemption; V. loss of hospital; VI. highway rights of way; VII. power lines; VIII. public water and sewage systems; IX. mismanagement of tribal funds; X. loss of government programs; XI. imposition of bond debt; and XII. loss of tribal property to Menominee County. The Chief Judge designated this judge as the hearing officer. The pending bill asks the court to "inform the Congress of the nature, extent, and character of the damages referred to in such bill as a legal or equitable claim against the United States or a gratuity." *See* S. Res. 137, 103d Cong. (1993); *see also* 28 U.S.C. § 2509(c) (1994).

With the parties' concurrence, the court set up a schedule, in the first phase of which a factual record was developed. Phase two was the filing of cross motions for summary judgment on Counts I, II, and III. The court heard oral argument on Count I (the Basic claim) on April 2, 1997. Oral argument for counts II and III (forest and mill mismanagement) was held on April 28, 1997. Phase three will resolve remaining issues.

### G. Developing the Record

The record is composed of two types of data. The first is the entire trial record that was assembled in the prior litigation, including all the fact findings made by Trial Judge Spector. In order to avoid creation of a new background record, the parties were given an opportunity to file exceptions to those findings of Trial Judge Spector that related to liability or the statute of limitations for the first three counts of the complaint—Basic, Forest Mismanagement, and Mill Mismanagement. The parties, in effect, stipulated that everything Trial Judge Spector found

---

or $275,000, whichever was the lesser amount. The section did not provide funding for other

types of termination expenses.

factually is a given in this litigation.[4]

The other type of data before the court consists of proposed supplemental findings offered by the Tribe, supported both by new information and the existing record. The new information consists primarily of expert reports. The court offered the Government several opportunities to challenge these supplemental proposed findings. The Government initially objected to the supplemental findings in a motion to strike dated May 7, 1996. The court rejected the primary basis for that objection in an order dated January 7, 1997, but gave the Government the opportunity to file more specific factual objections. By its filing of January 15, 1997, the Government notified the court that it would not object to Plaintiff's Supplemental Proposed Findings of Fact. Consequently, the court treats as stipulated all of Judge Spector's fact findings,[5] as well as the plaintiff's supplemental fact findings.

The Government's current motion for summary judgment on the first three counts thus assumes the correctness both of Judge Spector's underlying fact findings and the additional findings proposed by the Tribe. It contends that the *Menominee Basic* claim and the Forest Mismanagement claim are nevertheless defective in that they are based on a false premise—namely, that the adoption by Congress of legislation can ever constitute a breach of a fiduciary duty. As to the Mill Mismanagement claim, the Government argues that it is time barred and that no good grounds exist to overlook that bar. Before addressing these arguments, the

court will summarize the key elements of the factual background.

## BACKGROUND

### A. *Relationship with the United States*

The Menominee once held a vast amount of land that now makes up part of the states of Michigan and Wisconsin. Through several treaties, the Tribe peacefully ceded over fourteen million acres of land.[6] The treaty relationship began in 1817 with a treaty of peace and friendship. *See* 7 Stat. 153 (1817). This relationship continued through a series of treaties, the last of which was made in 1856.

Under the Treaty of 1848, the Government continued to exert control over the Menominee. *See* 9 Stat. 952 (1848). This treaty kept money, which originally was invested for the Tribe under the Treaty of 1836, 7 Stat. 506, invested "under the direction of the President," and the proceeds were to be used for education with the balance to be paid out or "applied for the benefit and improvement of said tribe, as the President, on consultation with the chiefs, may, from time to time, determine." Treaty of 1848, 9 Stat. at 953.

The Tribe ceded the last of its land in 1848 in exchange for 600,000 acres of land west of the Mississippi River. The Menominee, however, were dissatisfied with the land and refused to move to it. By the Treaty of Wolf River, 10 Stat. 1064 (1854), the Tribe ceded back to the Government the 600,000 acres in exchange for 276,480 acres of land on the Wolf River in Wisconsin to be held as Indian lands are held. About ninety–five percent of

---

**4.** Defendant did file certain limited exceptions to Judge Spector's findings on March 20, 1996. Defendant objected to ultimate findings that it viewed as incorrect as a matter of law. Defendant has not excepted to the underlying facts as established in the findings. Plaintiff filed limited exceptions not directly relevant to the pending motions. Plaintiff's exceptions were primarily to Trial Judge Spector's denial of some elements of the Mill Mismanagement claim.

**5.** With the exception of those fact findings that are more in the nature of ultimate legal conclusions and those challenged by plaintiff in connection with aspects of the Mill Mismanagement claim not addressed herein.

**6.** The Tribe ceded its land to the Government in consideration for "the kindness and protection of the Government of the United States, and for the purpose of securing to themselves posterity, and a comfortable home." 7 Stat. 342, 343 (1831). The Tribe also expressed through treaty its dependence on the Government for care. The Menominee "declare[d] themselves the friends and allies of the United States, under whose parental care and protection they desire to continue." *Id.* at 342–43. They also expressed their "confidence in their great father, the President of the United States, ... a kind and faithful guardian of their welfare." *Id.* at 345. The reservation was established "for the purpose of weaning [the Indians] from their wandering habits." *Id.* at 344.

this acreage is valuable forest land. Because the reservation was held as Indian land, the United States protected the lands from encroachment, the Tribe maintained their hunting and fishing rights, and the Tribe did not have to pay state taxes. From 1854 the Government held fee title to the Menominee Reservation in trust for the benefit of the Tribe and managed the affairs and properties of the Tribe.

With the exception of the period of termination, the Government has continued to control the remaining land and assets of the Tribe. An example is the Act of June 12, 1890, 26 Stat. 146. This act dealt with the sale of timber from the Menominee forest. All aspects of any sale required approval by the Secretary of the Interior, including time and place of the sale and the final price. The Secretary was to employ Indians when in his judgment it was practicable and beneficial to them.

Money was also set aside for the Secretary to "appoint a competent man to superintend these Indians" as well as an assistant superintendent. *See* 26 Stat. at 146. The superintendents were not Indians. The cost of the logging expenses after the first year were to be paid out of the Menominee funds held in the Treasury. The first year's expenses for the superintendent and assistant superintendent were to be reimbursed to the U.S. Treasury from the first proceeds from the sale of timber. One-fifth of the proceeds were to be placed in the Treasury to be used under the direction of the Secretary for the benefit of the Menominee. The residue was to be placed in the Treasury and gain interest. The amount gaining interest was to be paid to the Tribe on a per capita basis or expended for its benefit under the direction of the Secretary. The Menominee worked in their forest, but they were not given supervisory positions or taught how to manage their own forest and mill. In short, the Tribe was also not allowed to deal with its own finances. All fiscal decisions were made by the Government.

The Act of March 28, 1908, 35 Stat. 51, continued the practice of having the expenses of the logging operation taken out of the Tribe's account with the Treasury. It also provided for the building of sawmills for the conversion of timber into lumber. Again, the Secretary controlled all aspects of and proceeds coming from the logging operation.

The Senate Report regarding the Act of 1908 stated that the plan was to make the Indians self-sufficient. There was concern that having non-Indians manage all the affairs of the Indians was making the Menominee too dependent on the Government for daily living:

> The avowed object of all legislation pertaining to Indian affairs for the past half century has been to prepare and qualify the Indian for citizenship and the management of his own business. Because of his incapacity to manage his own property the Government has treated the Indian as a ward and has maintained guardianship over him.
>
> The work of preparing the Indian for the responsibility of providing for himself according to the ways of the white man in most instances has only resulted in making him more incompetent. He has been an idle spectator while others have managed his affairs. The tendency has been to weaken, not to strengthen, him. The result is, in a majority of cases, that the responsibility of caring for himself is thrust upon him when he is in no way prepared to meet it. He loses his property and becomes a charge upon the community.

S.Rep. No. 110, 60th Cong. 1 (1908). Nothing was done to address these concerns, however, and the Secretary, acting through the BIA, continued to exercise complete control over all financial affairs of the Tribe.

With the Government managing its affairs, the Tribe was able to pay for many services provided to it. In 1959 it was noted that the proceeds from the logging operation financed the tribal government, two parochial schools, medical care, and other services. Enrolled members of the Tribe annually received stumpage payments. For most of the time before 1959, the Tribe even paid salaries of BIA personnel.

An appropriation statute from Congress was required to release money earned from

the Tribe's forest. This meant that Congress decided how the Tribe's money was spent. Over the years, the Government approved the release of money for many reasons, including: to build homes for the tribal members; to purchase farming equipment, dairy stock, and other equipment and supplies to help make the Tribe self–supporting; to support old, disabled, or indigent members of the Tribe; to provide for the support and civilization of the Tribe; to supply building materials; to provide for the hospitalization of tribal members; and to pay for education, tribal government, land purchase and leasing, and other tribal needs.

Even when Congress appropriated money, the spending still had to be approved by the BIA. The BIA had final say about the Tribe's budget. The Tribe was given an amount with which to make a budget, but the BIA had veto power on the final budget. The control of the finances, investments, disbursements, and accounts thus belonged to the BIA.[7]

A tribal leader testified before Congress that although the tribal government acted in an advisory capacity to the Department of the Interior, the BIA was able to reject any resolutions the tribal government submitted to it. The Tribe, for example, objected to the hiring of a third forester by the BIA in 1955. The BIA ignored the objections. Two activities that the BIA totally dominated were the management of the forest and the mill. The BIA refused, for example, to approve a request by the Tribe for an investigation into the forest and the mill. The Advisory Council had a Forest and Mill Committee, but it was basically inactive. The tribal members were not trained to manage, nor did they take part in management decisions. No Menominee attended a forest-study tour that took place in 1950 or a forest-management

conference in 1951, even though both were held on the reservation.

Anthropologists George and Louise Spindler lived on the reservation at different periods of time until 1954. Their opinion was that at the time of termination, only fifteen percent and no more than twenty percent of the Menominee were able to cope adequately in the world outside the reservation. Drs. Verne F. Ray and Nancy O. Lurie, anthropologists at the University of Wisconsin, were of the opinion that the Tribe did not meet the Government's own criteria for termination.

In short, the record demonstrates that, prior to termination, the Tribe "enjoyed" a cradle-to-grave welfare existence, which ironically was largely financed by the Tribe itself. The Menominee had no real say in the management of their own resources, yet they were provided with the fundamentals of existence by others who managed those resources for them. The numerous reports in the record reflect the development of a dependent culture, one with no real opportunity to dictate its own affairs and hence no incentive to develop the skills needed for independent decision making.

### B. *History of the Termination Act*

The 1961 termination had its origins in 1947 when the Senate Committee on Civil Service sought to reduce the size of the BIA. The Acting Commissioner of Indian Affairs, William Zimmerman, suggested that the BIA could reduce employees and duties by withdrawing federal control and supervision over Indian affairs. To help facilitate the withdrawal of federal control, Indian groups were ranked on their ability to operate independently. The factors Mr. Zimmerman said were to be taken into account when ranking tribes were:[8] (1) degree of acculturation (including such factors as admixture of white

---

7. The BIA, using tribal funds, provided free medical and dental care, as well as prescription drugs, to all tribal members. An immunization program was included. The BIA also provided support for sufferers of tuberculosis by paying for sanitarium care and supporting members of the family. The BIA also used tribal funds to provide other services. Among these were welfare assistance, a loan program, and tribal police

and fire protection. Subsidized electricity and other utilities were provided on the reservation.

8. In Basic Finding Number 15, Trial Judge Spector found that the appraisal by the BIA was made without any prior study or investigation. This court finds, in any event, that conditions 2, 3 and 4 were not present in 1954, and condition 1 probably was not as well.

blood, percentage of literacy, business ability, acceptance of white institutions, and acceptance of the Indians by whites in the community); (2) economic conditioning; (3) willingness to dispense with federal aid; and (4) willingness and ability of the state in which the tribe is located to assume responsibilities. The Menominee were included on a list of ten tribes proposed by Mr. Zimmerman for early release. However, no termination legislation was passed at that time.

On July 13, 1951, the Menominee Tribe settled a claim against the United States for mismanagement of tribal assets and was awarded a judgment of $8,500,000.[9] These funds were placed in the U.S. Treasury as a credit to the tribe. A per capita distribution, which the Tribe wanted, was prohibited by the jurisdictional acts under which the claims were brought. The Tribe therefore needed congressional approval for a distribution of the funds. The House of Representatives passed House Bill 2828, which approved a $1500 distribution to each member of the Tribe. The Senate amended the bill so that its main purpose changed from a distribution of tribal funds to a termination of federal supervision that included the $1500 distribution to each member of the Tribe.

On June 20, 1953, Senator Arthur Watkins of Utah, the sponsor of the bill, visited the Menominee reservation and spoke at a meeting of the Menominee General Council.[10] He made it clear that the $1500 per capita distribution would be denied unless the Tribe agreed to the termination of federal supervision. The Tribe was left with the impression that termination was inevitable. After Senator Watkins's speech, the Menominee men and women present at the General Council meeting voted 169 to 5 (in a standing vote) to accept the principle of termination. No plans for or consequences of termination were discussed, and the Indians believed that termination could be reversed if it was proven undesirable.[11]

Within a month after Senator Watkins's visit, the acting chairman of the Advisory Council of the Tribe called another meeting. He had become concerned about the implications of termination as proposed under the Watkins bill. At that meeting, the assembled tribal members voted against termination, knowing that it would cost them their per capita payments. The standing vote, nevertheless, was 197 to 0. This vote was brought to the attention of Congress in the joint hearings on termination, but it had no influence on the subsequent course of events.

The Senate bill passed in July 1953. On March 10, 1954, the Joint Committee on Indi-

9. A jurisdictional statute passed in 1935 allowed the Tribe to sue the Government and recover damages. Settlement of the resulting suit addressed many claims. One arose from an incident in 1905, in which a windstorm blew down millions of board feet of timber on the Menominee reservation. As a result of concern that the timber would rot, Congress passed a statute that gave the Secretary of the Interior the authority to contract with mill owners to make lumber from the dead and down timber. The Secretary of the Interior ignored the timber for a year. Once the Secretary began to contract with mill owners for lumber, he did not enforce contract provisions that would have kept the contractors from wasting timber. The delay cost the Tribe money because some timber was ruined before it could be used. A second claim arose from the Government's clear cutting of Menominee land in violation of the Act of March 28, 1908, 35 Stat. 51. The remaining claims were based on mismanagement of the timber and forest industry, failure to deposit money promptly and pay interest on interest bearing funds, loss of interest on special funds, and failure to provide a proper accounting.

10. Between 1928 and 1961, the Menominee government was made up of (1) a General Council, which included all enrolled adult members of the Tribe and met at least twice a year, and (2) an elected Advisory Council, which served as the governing body when the General Council was not in session. The twelve members of the Advisory Council were elected biannually. The Advisory Council selected its own secretary and chairman. The Menominee constitution placed final authority in the General Council, which at times reversed the decisions of the Advisory Council.

11. Senator Watkins had long advocated the termination of federal services to Indian tribes and forcefully let his opinion be known in subcommittee hearings. As chairman of the Senate Subcommittee on Indian Affairs, he held hearings on the withdrawal of Government support from Indian tribes as early as 1947. Senator Watkins was responsible for initially holding up the Laird bill, which would have authorized a $1500 per capita payment to each member of the Menominee tribe, until it was transformed into a bill to terminate federal supervision of the Tribe.

an Affairs conducted three days of hearings on the question of Menominee termination. Senator Watkins was the only member of the joint subcommittee present on the third day. It was the Watkins version that was, in substantial form, adopted in June 1954. The bill was signed into law on June 17, 1954.

Trial Judge Spector, in his Basic opinion, described the Termination Act as follows:

> Briefly summarized, the Act closed the rolls of the Menominee tribe as of the date of the enactment; authorized a $1500 per capita distribution to enrolled members; authorized the tribe to retain at its own expense (under contracts approved by the Secretary) the services of management specialists to assist in studies, recommendations and reports to carry out the terms of the Act by December 31, 1957; required the tribe to prepare a plan for future control of tribal property and service functions on the reservation; declared that (unless an earlier date was agreed upon) the responsibility of the United States on the reservation would terminate December 31, 1958; provided for transfer on that date to the tribe all property theretofore held by the Government in trust for the tribe; exempted the initial distribution from federal and state income taxes; provided that with the transfer of tribal property, all federal services would cease and all federal laws affecting Indians would cease to be applicable to the Menominee who would thereafter be subject to state laws; and provided that the interests of minors and legal incompetents were to be protected by the Secretary by such means as he deemed adequate.

*Menominee Tribe of Indians v. United States,* No. 134–67, slip op., at 13–14 (Ct.Cl. July 19, 1978). Federal control of the Tribe would end, and the reservation would be turned into a new county in the State of Wisconsin. Becoming a county would require that the Tribe develop a self-sufficient government and generate income to pay for those services previously furnished by the Federal Government. The Tribe itself was to come up with a plan for accomplishing this transition.

Passage of the Termination Act did not, therefore, immediately end federal supervision and control. Rather it was initially contemplated that there would be a transition period of four years after passage before termination would be fully effective. For reasons explained below, two amendments extended the time for implementation of termination. The first one extended the time until December 31, 1960, and the second one settled the date at April 30, 1961. The Tribe was given the responsibility for planning how the Government would transfer the tribal assets at termination. Review of the record persuades the court that it should have been apparent in 1954 that the Menominee in fact were not prepared for the termination of federal control, and that the Tribe would not be able within the transition period to prepare itself to run schools or hospitals, maintain roadways, or perform any of the many other services for which a normal county government is responsible.

One of the factors in first suggesting the Menominee Tribe for termination had been its supposed good financial health. It is clear that this was a faulty premise. When the Termination Act was passed, the Tribe had a balance in the U.S. Treasury of $9,960,-895. This figure was not the norm, however, and probably misled many in Congress. Had it not been for the $8 million settlement, the Tribe would have had approximately $2 million in its account. Shortly after termination, $4,905,000 was distributed in a $1500 per capita payment to the 3270 individuals on the rolls of the Tribe. Moreover, a recomputation of an earlier per capita payment determined that the payment had been wrongly calculated. The tribe voted for payment in full of the deficiency, further reducing the tribal funds by $2,268,240 in September 1955. Thus after the Termination Act was passed, the Menominee bank account returned to a balance that reflected the normal financial status of the Tribe before the settlement.

The facts about the Menominee's financial status were later brought to the attention of Congress. On February 27, 1956, James Frechette, the Menominee Advisory Council chairman, testified before the House Subcommittee on Interior and Insular Affairs as

to the finances of the tribe: "Our capital, which was approximately $10 million only two years ago is now down to $2,276,849.06." (Pl.'s Ex. J–28 at 133.)

BIA Program and Administrative Officer R.W. Quinn recognized the problems that would flow from termination but had no means by which he could address them. In a memorandum to the Commissioner of Indian Affairs dated January 31, 1955, Quinn realized the tribe alone could not handle the problems of termination. He suggested the need for diagnosis by expert social scientists to help prepare the Menominee for termination, but no such studies were ever done by the Government. The Menominee could not rely on the BIA to help plan for termination because the staff for the tribe was cut immediately after enactment of the Termination.

A joint resolution of the Wisconsin legislature created the Menominee Indian Study Committee (MISC) in 1955. Its job was to study the transition problems and to develop recommendations and legislative proposals to the state legislature. This would permit the introduction of necessary bills during the 1957 legislative session. Its research was therefore directed to dealing with termination, not to whether termination was appropriate for the Menominee. The goal of MISC was never to develop a termination plan for the Tribe. That was the Tribe's task, even though the MISC found the issues to be too complex for the committee itself. The MISC, made up of members who were better educated and knowledgeable in the areas of government and business that had to be covered by the plan, could only be said to have "skimmed the surface of these problems." (Pl.'s Ex. R–94, ch. 5, at 10.) The committee thus left issues that they considered complex to be decided by members of a tribe with very little education.

The Government took the view that the Tribe's lack of education could be rectified by an "adult education program." This program, implemented in 1956, concentrated on the forms and responsibilities of state and county government and business organization. These were important topics for a group of people who were about to become responsible for themselves, but the large majority of the people could not comprehend the material being taught to them. Most of the students dropped out of the program because they did not have the necessary base of experience or training. The Menominee were expected to plan and care for themselves, but they did not have even the most basic skills in generating income or running a government to be able meaningfully to attend a class on the subjects.

Any objective investigation into the general welfare of the Menominee at the time termination was proposed would have uncovered discouraging facts. Menominee children, at the time the Termination Act was being implemented, generally reached the eighth grade before discontinuing their studies. Even at this level, the older students only attended school half a day and worked the other half. The adult members of the tribe responsible for decision making were even less educated than the next generation. Many older Menominee did not speak English and had to have termination explained to them through interpreters. In 1952 less than five percent of tribal children had adequate diets. In 1954 the percentage of Menominee families and individuals receiving some public assistance was over six times the state average.

The problem with the Termination Act was the time frame within which it was to be implemented. State Senator William F. Trinke was of the opinion that the Menominee had "not reached the status where they [could] control their own property, and the government should [have] retain[ed] its responsibilities under the treaty for another twenty to twenty-five years." (Pl.'s Ex. R–82 at 2 (letter from Wis. State Sen. William F. Trinke to U.S. Rep. Gerald T. Flynn (D–Wis.) of 6/18/59).) Dr. David W. Ames, the University of Wisconsin anthropologist who did field studies among the Menominee, suggested that the Government should phase out withdrawal of its services. Dr. Ames believed that withdrawal of the most basic Government services would take ten years, and he stated that certain programs, such as welfare, education, and work habit re-adjustments would take longer. (Pl.'s Ex. R–88 at

113–14.) George Kenote, member of the tribal study committee and former BIA employee, stated that the committee could not explain the complex matters to the tribal members in the amount of time they had been given. Even if the Tribe could one day be ready to sever ties with the Government, it became rapidly apparent that a 1958 termination date was unreasonable.

Passage of the Termination Act caused a flurry of activity within the Tribe aimed at either reversing or delaying the legislation. Tribal and other lobbying resulted in two postponements of the termination date. The first moved the date to December 31, 1960. The second and final one moved it to April 30, 1961.

In 1954 Raymond H. Bitney, superintendent of the Menominee Agency of BIA, was aware that the Menominee were "violently opposed to withdrawal." He knew that the attitude of the Tribe was that if Congress wanted termination, Congress should plan it because the Indians wanted no part of it. (Pl.'s Ex. R–19 at 2 (letter from Mr. Bitney to the Commissioner of Indian Affairs of 12/10/54).) He restated this opinion in 1955. (Pl.'s Ex. R–22 at 2 (letter from Mr. Bitney to the Commissioner of Indian Affairs of 2/1/55).) As late as 1957, the Menominee still did not understand all aspects of termination. The Tribe was not able to plan for or stop termination. Mr. Kenote wrote that he "found a doldrums of inaction" because no one in the Tribe knew how or what to do. (Pl.'s Ex. R–69 at 3 (letter from Mr. Kenote to Congress of 5/2/98).)

In 1960 the General Council of the Tribe sent a delegation to go to Washington to attempt to persuade Congress to further postpone termination. Advisory Council Chairman James Frechette was on the delegation. After discussions with the BIA and Congress, the delegation decided other assistance was more important than postponement. The delegation sacrificed the argument of postponement in order to gain subsidies from the Government for education, health, and welfare programs. Once the news that the delegation had accepted subsidies and not argued for postponement without accepting any compromise was reported to the General Council, the delegates were discharged for substituting their own views for those of the General Council.[12] A new delegation was elected.

The new delegation was committed to avoiding termination. A petition was signed in 1960 by 600 tribal members seeking repeal of the Termination Act and a return to federal supervision. The Tribe was not the only group seeking repeal of the Termination Act. Shortly before the final termination deadline, the Wisconsin state legislature unanimously approved a resolution requesting repeal.

Termination, although delayed, nevertheless went forward. Final termination of supervision was accomplished by Proclamation of the Secretary of the Interior on April 29, 1961. See 26 Fed.Reg. 3726. Once the relationship between the Government and the Tribe ended, reservation land was conveyed by deed from the Government to a corporation, Menominee Enterprises, Inc. (MEI). The deed attached restrictions to the land that prevented alienation or encumbrance for thirty years beginning on April 26, 1961. A covenant that required sustained yield management of the land in perpetuity was also attached to the deed.

With the governance of tribal affairs passing from the BIA to the newest and smallest county in Wisconsin, the adverse effects of termination quickly became apparent.[13] The county had no experience in supplying the type of community services that local governments routinely provide. The main problem was a lack of revenues. Costs for operating the county were significantly higher than the previous cost to the tribe of operating the reservation because its members were too

12. A motion was made to censure Mr. Frechette and to remove him from office. Most members present abstained from the vote, which was defeated 47 to 28. However, Mr. Frechette never ran for tribal office again.

13. Although the MEI held the assets of the Tribe and paid a majority of the county's taxes, actual control passed to the county government, which had a seven–member board that dealt with such issues as collecting taxes and coordinating with neighboring Shawano County as to the joint school system and court system.

poor to maintain a sufficient tax base and because the Tribe had to count on the sawmill, the only significant industry on the Menominee reservation, to generate income. Prior to termination, however, the Tribe had not participated in management of the mill. Members of the Tribe made up the labor force but were not promoted to supervisory positions. Inexperienced individuals suddenly became responsible for the operations of a fifty-year-old mill that was in need of significant improvements. The mill had many safety violations and outdated equipment that kept it from being productive, all of which were exacerbated by the transfer of management. The problems of generating revenue from the mill were compounded by the restriction on the amount of timber the Tribe was allowed to harvest per year. It became necessary to derive more profits out of the mill. Yet this need clashed with the idea that the mill should provide a job for any Menominee who wanted one.

Another concern was how the land within the new county's borders would be appraised and taxed by the state. Tax appraisers in Wisconsin valued the forest at about $30 million based on stumpage prices, and they valued the Menominee land at about $4 million. To help ease the new tax burden faced by the Tribe, the Wisconsin state legislature valued the forest at forty percent of its value, i.e., approximately $12 million. The members of the Tribe had not dealt with real estate in the past. They understood the concept of a house belonging to an individual but not the land it was on.[14] The sudden responsibility for paying for the land upon which one lived, as well as paying taxes, was a shock to most Menominee, and few residents of the county had the job skills with which to earn the money to pay the taxes.

Other problems abounded. After termination, the Menominee school was closed. Indian children were sent to school in neighboring Shawano County. This created much stress in the community. The Menominee children in school increasingly fell behind their peers and were below district and national norms. Over half of the Menominee students aged five to seventeen were failing one or more subjects. Only thirty percent of the Menominee members of the 1973 senior class of Shawano High School who entered the ninth grade graduated. The number of white students who entered the ninth grade at the same high school and graduated was eighty-three percent.

The Menominee lost their only doctor after termination. The reservation hospital was also closed because it did not meet state standards, even though the BIA had remodeled it not long before termination. The money used to remodel the hospital, between $250,000 and $350,000, came from tribal funds.

Another problem not considered by Congress before termination was the working habits of the labor force. The Government did not spend time or money to study the differences between the Menominee culture and the culture of American whites. Had a study been done, the Government would have realized that although most whites in Wisconsin would work steadily for fifty weeks a year while putting away excess wages into savings, a Menominee might stop working when he had met the immediate needs of his family and not work again until another monetary need arose. Such information could have allowed the Government to plan a way to deal with providing labor for the mill, which required workers who would work constantly, especially in management positions. Knowledge of such problems might have convinced Congress to delay termination until a time when the Tribe had developed a culture that lent itself to operating a mill that could do business with its white neighbors.

The Menominee had become accustomed to receiving a wide variety of services, including health care and utilities, free of charge. After termination, a number of families lost water and electrical services when they became responsible for paying for these

---

14. Another concept that was new to the Tribe was the idea of holding land as a private possession. The Allotment Act of 1887 provided a way for individual Indian families to own their own portions of land. The Tribe rejected the Allotment Act. All Menominee land was held in tribal status until the very day of termination. The tribal members had the responsibilities, including payment of taxes, of individual land ownership thrust upon them overnight.

services themselves. The atmosphere of federally provided necessities had created a culture with little regard for money and even less regard for tribal government. It is not surprising that the Tribe was not able to break these old habits in a period of seven years between 1954 and 1961.

The bleak economic picture of the Tribe did not improve after termination; it deteriorated. Representatives of Menominee County, MEI, and the new Menominee Common Stock and Voting Trust formed a committee to suggest corrective legislation to Congress and the Wisconsin state legislature. The committee made its report in 1965, the same year a state law required the legislature to review Menominee County. The committee report showed that conditions in the county had not improved over the four years after termination: the Menominee had an inadequate tax base; a high rate of tuberculosis; a high ratio of welfare and correctional costs compared to income; a lack of adequate job training; and high rates of school dropouts and delinquency. The condition of the Tribe was comparable to that of lower classes in the United States during the Great Depression of the 1930s. Only forty-six percent of Menominee ages sixteen to sixty-four were in the labor force. In part this was because of the poor health services for the Tribe. Twenty-five percent of this age group, excluding inmates and students, were ill or disabled. In 1971 the unemployment rate in Wisconsin was five percent compared to twenty-six percent in Menominee County.

Tribal members also compared unfavorably to the rest of the state in regard to income. The lack of income for families translated into low tax revenues for the county. The tribal members paid no taxes prior to termination. The individuals were not prepared for the responsibility of paying taxes. Twenty percent of families in the state had an income over $15,000, while no Menominee families exceeded that amount. Although property taxes were some of the highest in the state, such taxes could not be counted on to generate revenue because the average Menominee family of five subsisted on $2300 per year. Individuals thus did not earn enough income to support a sufficient

tax base for the county. Saddled with an inadequate mill and a limit on the amount of timber that could be cut from the forest in a year, MEI still supplied ninety percent of the taxes to Menominee County. The Government helped the county by paying $2,000,000 for the first ten years after termination. Without this infusion of federal money, the county would have faced bankruptcy.

This sharply truncated recitation of events leading up to and following termination persuades the court that the Tribe, indeed, was not ready for termination in 1954, and that the period of termination was one during which problems inherent to the Tribe's dependent relationship were exacerbated. The period from shortly before termination until when it ended was one in which the fragile ability of the Tribe to function as a healthy, cohesive unit was seriously disrupted. Whether any of these summary findings have legal significance, however, is addressed in the discussion below.

## DISCUSSION

### A. *Effect of the Congressional Reference*

■ The congressional-reference statute calls for the court to assess whether the claim referred constitutes a legal or equitable claim. The term "legal claim" has the same meaning in a congressional reference as it does in ordinary cases:

> [T]he words "legal claims" as used in the congressional reference statute imply no special meaning beyond the conventional understanding of that term: a claim based in the invasion of a legal right, that is "one of property, one arising out of contract, one protected against tortious invasion, or one founded on a statute which confers a privilege."

*Spalding & Son Inc. v. United States,* 28 Fed.Cl. 242, 247 (1993) (quoting *Tennessee Elec. Power Co. v. Tennessee Valley Authority,* 306 U.S. 118, 137–38, 59 S.Ct. 366, 369–70, 83 L.Ed. 543 (1939)). Presumably, if a litigant had a viable legal claim a congressional reference would be unnecessary. For that reason the term seems most appropriate for those claims that this court could recognize but for the bar of the limitations period. It

has long been accepted that a congressional reference allows this court to hear a claim that is filed after the limitations period has expired. "[A] simple reference of a case by Congress to this court, of itself, waives no legal defense which the Government, as defendant, may have, excepting only the statute of limitations." *Cruger v. United States,* 11 Ct.Cl. 766, 770, 1800 WL 881 (1875); *see California Canners & Growers v. United States,* 7 Cl.Ct. 69, 98–99 (1984), *rev'd on other grounds,* 9 Cl.Ct. 774 (1986) (report of review panel).

■ The term "equitable claim," however, has been the subject of some controversy over the years. In *Shane v. United States,* 3 Cl.Ct. 294 (1983), the court attempted to summarize the debate:

> The word "equitable" in a congressional reference case was interpreted originally as meaning a broad moral responsibility on the Government's part.... This view, however, has eroded over the years and more recent cases have adopted the rule that the United States must commit some "wrong" in order to incur liability under an equitable claim.... "An equitable claim in a Congressional reference must rest on some unjustified governmental act that caused damage to the claimants. Absent a finding of negligence [or wrong doing] on the part of governmental employees, any award herein would be a gratuity."

*Id.* at 304 (citations omitted) (alteration in original) (quoting *Wong v. United States,* No. 3–74, slip op., at 12–13 (Ct.Cl. Nov. 23, 1977)).

Later, in *Paul v. United States,* 20 Cl.Ct. 236 (1990), Judge Harkins carefully reviewed and catalogued the history of congressional reference decisions and concluded, with respect to equitable claims, that:

> [a]n "equitable claim" is not reported unless the facts create an obligation that the United States should recognize. The obligation may arise from some unjustified government acts that caused damage to

the claimants, or it may arise when the government acquires benefits through overreaching by its agents or by misleading representations by government agents that are beyond the scope of delegated authority. In every case when an "equitable claim" was reported with a recommendation for payment of compensation, the particular facts involved reasonably spell out a government obligation.

*Id.* at 269 (footnotes omitted). It is not clear what specific conduct or failures "reasonably spell out a government obligation," but the references to "unjustified" acts causing damage and to the government receiving "benefits" through the overreaching or misleading actions of its agents provide some concrete indications that what is required is a breach of a duty owed by the Government.

The reference in *Shane* to negligence or wrongdoing harkens back to earlier decisions. In *B. Amusement Co. v. United States,* 148 Ct.Cl. 337, 180 F.Supp. 386 (1960), the court stated that "defendant's liability must rest on some unjustified act or omission to act which caused the plaintiffs damage; otherwise any award would be a pure gratuity." *Id.* at 342, 180 F.Supp. 386. This was echoed in *Webb v. United States,* 192 Ct.Cl. 925, 932, 1970 WL 5994 (1970): "[T]he test of 'equity' is whether the claim asserted would be recoverable against a private party." And in *Estate of Braude v. United States,* 35 Fed.Cl. 99, 109 (1996): "[I]t would appear that Congress intended the phrase 'equitable claim' to cover only situations where there is no adequate remedy at law, the government has engaged in wrongdoing, and the court's evaluation of that wrongdoing involves a legal determination."[15]

Indeed, as suggested in *Gay Street Corp. v. United States,* 130 Ct.Cl. 341, 127 F.Supp. 585 (1955), it seems very few things, if any, would constitute a gratuity if "equity" included claims based solely on broad moral

---

15. In *Estate of Braude,* the court, although stating its belief that the modern standard requiring a Government wrong for an equitable claim was the correct standard, also analyzed the claim under the purely moral standard. "[I]f Congress intended the phrase 'equitable claim' in 28 U.S.C. § 2509(c) to involve general moral principles and to encompass all claims that involve the government owing compensation as a matter of conscience, then plaintiff has established an equitable claim here." *Estate of Braude v. United States,* 35 Fed.Cl. 99, 109 (1996).

considerations without any wrongful act or omission by the Government that had some established juridical reference:

We believe the term "gratuity" as used in the congressional reference statute is synonymous with the term "equity" in its moral sense. In its broadest and most general signification, equity denotes the spirit and habit of fairness, justness, and right dealing which would regulate the intercourse of men with men—the rule of doing to all others as we desire them to do to us; or as it is expressed by Justinian— "to live honestly, to harm nobody, to render to every man his due." It is therefore the synonym of natural right or justice. But in this sense its obligation is ethical rather than jural, and its discussion belongs to the sphere of morals. It is grounded in the precepts of the conscience, not in any sanction of positive law.

*Id.* at 350 n. 1, 127 F.Supp. 585.

A congressional reference therefore potentially helps a claimant by exposing the Government to claims as to which private individuals would be subject to liability but the Government usually is not. For example, the tort of slander is a civil claim to which the Government has not waived its sovereign immunity under the Federal Tort Claims Act, 28 U.S.C. §§ 2671–2680 (1994), yet it has been considered as an equitable claim in a congressional reference. *See California Canners,* 7 Cl.Ct. at 86. An equitable claim recognized under a congressional reference must, therefore, have some basis in positive law, even though that positive law is not enforceable in the Court of Federal Claims as a source of legal rights.

■ This court holds that, for the plaintiff to have an equitable claim against the Government, the Government must have had a duty to the plaintiff and must have breached that duty by committing a wrongful or negligent act that caused the Tribe damage. It would not be sufficient, in other words, for the court to find that Congress's actions in prematurely terminating the Tribe were simply "immoral" in the broadest sense.

B. *Application of the Standard—The Basic Claim*

■ The "Basic" claim is one for a breach of trust by Congress in passing the Termination Act. It is summarized in the Tribe's brief of August 13, 1996:

When Congress terminated federal protection and services for the Menominee Tribe in 1961, it did so in complete disregard of the fiduciary duties the United States had undertaken as guardian and trustee of the Menominee Tribe. Those duties were rooted in treaties and statutes specific to the Menominees, and had been carried out steadily for more than a hundred years.... The Tribe had come to rely completely on those protections and services, and had shaped its day-to-day life around them.

The Menominee paid for these protections and services by ceding over 14 million acres of land....

The Tribe is not suing for termination of federal protections and services per se, but for their termination prior to the time the Tribe was able to manage its own affairs without them.... [T]he United States (acting through Congress) terminated the trust relationship in reckless disregard of many warnings that the Tribe would not be able to manage its affairs without the federal support provided up until then— warnings that were amply borne out.

This fundamental duty not to injure die beneficiary of the trust was breached by the United States (i.e., Congress) when it put the Termination into effect on April 30, 1961.

The court is prepared to accept a number of the factual predicates to this claim. For example, the United States, acting through the Department of the Interior, had general fiduciary responsibilities to the Tribe in the nature of those of a guardian to a ward. It is also true that the Tribe was completely dependent on the Government for the daily operation of the reservation, including such fundamental features as jobs, schools, health care, and utilities. The court agrees, further, that the Tribe was not ready for independence in 1954 or 1961 and that Congress's investigation of its status was inadequate.

The court would even agree with the plaintiff that the decision to end the Government's relationship with the Tribe when it did was a serious mistake of judgment. Despite these circumstances, the court is persuaded for the following reasons that a payment of monies for this claim would be a gratuity.

The earlier litigation establishes that *Menominee Basic* exceeds the jurisdiction of the court because it was not predicated on the nonperformance of any judicially enforceable duty. *See Menominee Basic,* 221 Ct.Cl. at 519–20, 607 F.2d at 1343–44. The court "assume[d] arguendo ... that such a trust relationship existed with respect to the Menominees." *Id.,* 221 Ct.Cl. at 513, 607 F.2d at 1340. However, it held that "Congress has [not] empowered us to hear and to determine nonconstitutional claims that a fiduciary duty toward Indians has been breached by the passage of legislation by the Congress itself." *Id.,* 221 Ct.Cl. at 516, 607 F.2d at 1341. As the Federal Circuit explained in *Menominee,* 726 F.2d at 714: "[T]he Court of Claims could not entertain any non-constitutional claims (including a claim for breach of fiduciary trust) that Congress itself violated any duty toward the Tribe by passing and enacting the Termination Act." The reason the original case was not successful was because the Termination Act was not the source of plaintiff's rights. Instead, it constituted the alleged breach. *See Menominee Basic,* 221 Ct.Cl. at 516, 607 F.2d at 1341.

■ It follows, therefore, that any contention that the passage of the Termination Act was a breach of a fiduciary duty cannot be a legal claim. Nor does the congressional reference change this fact. "A congressional reference case in this court cannot reconsider legal claims made and rejected in prior litigation." [16] *Sea–Gate, Inc. v. United States,* 4 Cl.Ct. 25, 30 (1983) (citations omitted). Plaintiff concedes as much. The Tribe does not argue that it has a legal claim and seeks instead to establish an equitable claim. [17]

Plaintiff relies on the theory of breach of fiduciary duty to support its assertion that it has an equitable claim. Plaintiff believes that the treaties and statutes between the Government and the Tribe created a relationship comparable to a routine relationship between a guardian and a ward. Such a relationship, if it exists, would create a fiduciary duty in the guardian. One aspect of a routine guardian and ward relationship is that a guardianship of an incompetent may not be terminated by the guardian unless it appears to a court that the ward has reached a state of competency and is able to manage its own affairs. *See* 39 Am.Jur.2d *Guardian and Ward* § 54 (1968). That duty, the argument goes, was breached when the Government severed its relationship with the Tribe in an attempt to make the Tribe self–sufficient. Plaintiff argues, and, as indicated, the court agrees, that the Government did not determine if the Tribe was able to manage its own affairs and that, in fact, the Tribe was unable to do so.

■ The relationship between a guardian and a ward is a well-established one. A claim that a guardian breached that duty therefore has a basis in positive law. Is that sufficient to preserve *Menominee Basic* as an equitable claim? It is this hearing officer's view that it is not.

---

16. The mere adoption of a reference is not, by itself, a grant of new jurisdiction to the court nor does it create a cause of action where one would not otherwise exist. "That resolution of a single branch of Congress is not a statute and does not seek to change the applicable rules of law or to set aside the doctrines of res judicata and collateral estoppel.... [W]e cannot ascribe to the resolution of reference any effect on the governing rules of law." *Estate of Fairbank v. United States,* 164 Ct.Cl. 1, 8 (1964). As explained in *Paul,* "[t]he reference of the bill for a report under 28 U.S.C. § 2509 does not amount to adoption of the language of the bill to be reported." *Paul,* 20 Cl.Ct. at 265.

17. To successfully argue that the Basic claim should be recognized as an equitable one, plaintiff must take advantage of both beneficial effects of a congressional reference. Even if recognized as a legal claim, the Basic claim would have been untimely. The original claim would have filed on April 25, 1967. Although the Termination Act was implemented on April 30, 1961, the act was passed in 1954, more than six years before the claim was filed. In other words, the statute of limitations would have to be waived.

■ The fact that these circumstances came before the court in a congressional reference does not change the underlying parameters of the relationship between the Tribe and the Government. The action that is the basis of the breach allegation is an act of Congress. The court cannot ignore the fact that Congress has absolute and plenary power to change or abrogate, by statute, a prior treaty with an Indian tribe, as long as the statute does not violate the Constitution. *See Menominee Basic,* 221 Ct.Cl. at 517, 607 F.2d at 1342. An act of Congress may supersede a prior treaty, and a treaty may supersede a prior act of Congress. An act of Congress can conflict with a treaty. *See Lone Wolf v. Hitchcock,* 187 U.S. 553, 566, 23 S.Ct. 216, 221–22, 47 L.Ed. 299 (1903). Article I, section 8, of the Constitution specifically commits to the sole responsibility of Congress the role of dealing with the Indian tribes. *See id.* at 564, 23 S.Ct. at 220–21. Any discrepancies that arise between statutes and treaties are beyond the scope of the judiciary and must be settled by the political arm of the Government. *See Thomas v. Gay,* 169 U.S. 264, 271, 18 S.Ct. 340, 342–43, 42 L.Ed. 740 (1898). In these exercises of legislative prerogative, the judiciary may not interfere; it would constitute a usurpation of Congress's constitutional responsibilities in two respects: Congress has plenary power with respect to the Indian tribes; and Congress, not the judiciary, is assigned the role of judging the wisdom of legislation.

If this hearing officer's understanding is correct of both the court's role in a congressional reference and the inherently unreviewable nature of Congress's actions in adopting statutes, particularly ones relating to Indian affairs, it follows that there is no analogy in the law on which to base an equitable claim that a congressional statute ending a relationship with an Indian tribe is a breach of fiduciary duty. The guardian-and-ward analogy simply breaks down in the context of a congressional exercise of discretionary, constitutional power to legislate this nation's dealings with formerly sovereign tribes. Legislation, in other words, however wrongheaded,[18] can never constitute "wrongful"

conduct in a judicial sense. Legislation inherently involves the exercise of judgment. It may be unwise, it may be wrongfully motivated, it may be ill-considered, and yet it would not be the role of the judicial branch to sit in judgment of Congress's actions. The court would, in effect, have to fabricate norms of conduct out of its hip pocket to apply to the inquiry.

For the plaintiff to prevail in this case, therefore, it would take more than a removal of the sovereign-immunity barrier. A new theory of liability which is not recognized at law or equity would have to be invented. This is explained in *Menominee Basic,* where the U.S. Court of Claims expressed its doubt that any claim would be found even if jurisdiction existed.

> The concept that a valid Act pertaining to Indians can be, in itself, a violation of fiduciary duty, which is vindicable as a legal claim, was not at all formed when the predecessors of section 1491 were passed, and in 1946 when section 1505 first became law such a cause of action appears to have been deemed a purely "moral" (and redressable only after the Indian Claims Commission under section 2, . . . or under a properly worded special jurisdictional act). It is of course common ground that section 1505 blankets only legal, not purely moral, claims.

*Menominee Basic,* 221 Ct.Cl. at 518, 607 F.2d at 1342–43 (footnotes omitted).

■ There is circumstantial proof that the court's position is correct. The only instances in which a constitutional act of Congress has been held to be a breach of fiduciary duty has been where a specific jurisdictional statute created the possibility of such liability. The clearest example is the Indian Claims Commission Act (ICCA). *See* 25 U.S.C. § 70a (1976) (repealed 1976). The ICCA conferred upon the Indian Claims Commission the ability to hear the following claims against the United States on behalf of any Indian tribe:

> (1) claims in law or equity arising under the Constitution, laws, treaties of the United States, and Executive orders of the

---

18. So long as it is not unconstitutional.

President; (2) all other claims in law or equity, including those sounding in tort, with respect to which the claimant would have been entitled to sue in a court of the United States if the United States was subject to a suit; (3) claims which would result if the treaties, contracts, and agreements between the claimant and the United States were revised on the ground of fraud, duress, unconscionable consideration, mutual or unilateral mistake, whether of law or fact, or any other ground cognizable by a court of equity; (4) claims arising from the taking by the United States, whether as the result of a treaty of cession or otherwise, of lands owned or occupied by the claimant without the payment for such lands of compensation agreed to by the claimant; and (5) claims based upon fair and honorable dealings that are not recognized by an existing rule of law or equity.

*Id.* Of particular note is clause (5), where the ICCA specifically made possible a determination that a treaty or legislation constituted unfair and dishonorable dealings, even though "not recognized by an existing rule of law or equity." *See id.* § 70a(5); *Red Lake Band v. United States,* 17 Cl.Ct. 362, 383 n. 15 (1989).

The ICCA, in other words, specifically created the potential for liability for conduct that would not violate any "existing rule of law or equity." By merely forwarding this congressional reference, the Senate has not waived the sovereign's underlying immunity from this type of claim.[19] In a congressional reference, a claim not recognized at law or equity is a gratuity. It follows that any

claim that could only be recognized under ICCA § 2(5) would be the equivalent of a gratuity in this congressional reference.[20]

The court notes, finally, that in addition to the fact that a payment on the Basic claim would be a gratuity, it is fundamentally one as to which the court could provide Congress no real guidance in terms of setting the amount of an appropriate payment. How does one measure damages, in a juridical sense, for loss of tribal status? Congress may well wish to give the Tribe money, as a gratuity, for the disruption caused by the premature termination. There would be precedent for such a payment in the sense that gratuities were authorized through the fair–and–honorable–dealings provision of the ICCA. The court cannot, however, in light of the strictures of 28 U.S.C. § 2509(c), recommend that such a payment would be for a legal or equitable obligation.

### C. *Forest Mismanagement Claim*

In Count II the Tribe claims that the Government mismanaged the forest by unduly restricting the harvest and by causing overgrowth and lower profits. The Tribe asserts the Government had the duty to study forest production and increase the amount of allowable cut. The count involves two distinct time periods: pre- and post-termination.

An obvious problem with this count is that the restrictions complained of all are traceable to legislation. Statutory harvest limits existed as law even before the Termination Act was passed. The Secretary of the Interior was given discretion on how to cut the forest under the 1908 Menominee Forest Act,

---

19. This fact distinguishes the reference from the one in *Alabama–Coushatta Tribe v. United States,* 28 Fed.Cl. 95 (1993). As the court there points out, the referral specifically authorized consideration under the "fair and honorable dealing" standard of the ICCA. *See id.* at 106.

20. The court has reviewed the cases cited by plaintiff for the proposition that a claim under the ICCA for breach of trust due to adoption of a constitutional statute could also arise under other than "fair and honorable dealing" theories. The court is not persuaded that those cases stand for that proposition. At best they are unclear. Plaintiff is forced to argue that the court or commission "did not discuss the fair and honor-

able dealings clause, so it must have assumed the [claim] fell under one or more of the first four clauses." (Pl.'s Supplemental Mem. of 3/28/97 at 4.) This court is left, however, with the unambiguous ruling of the U.S. Court of Claims in *Menominee Basic* that a breach-of-trust claim cannot be based on passage of a constitutionally sound statute, absent special jurisdictional legislation.

Nor is the citation to the Tenth Circuit opinion in *Pelt v. Utah,* 104 F.3d 1534 (1996), helpful. That suit was brought against a state, not the federal government, and the underlying trust relationship was found to arise from federal legislation, not be breached by it.

35 Stat. 51, as long as "not more than twenty million feet of timber [was] cut in any one year." 35 Stat. at 51. Such restrictions continued into the 1950s. Just like the Termination Act, these statutes were an exercise by Congress of its plenary power to deal with Indian tribes. Restrictions after 1961 were the result of the forest-management plan, which was created pursuant to the Termination Act and which stated that the termination plan "shall contain provision for protection of the forest on a sustained yield basis." 25 U.S.C. § 896 (1970) (repealed 1973). It would appear, therefore, that the second count cannot state a legal or equitable claim for the same reason that count one is barred.

Plaintiff tries to avoid this problem by focusing attention on the role of the BIA which, admittedly, had a duty to manage the forest, albeit within statutory constraints. Plaintiff argues that the BIA had a fiduciary duty to inform Congress about the mismanagement of the forest. It is the inaction of the BIA, the Tribe contends, that constitutes a breach of its independent fiduciary duty.

■ This court has found breaches of fiduciary duty by the Government on occasions when an agency has violated trust duties imposed by legislation. *See Duncan v. United States,* 229 Ct.Cl. 120, 667 F.2d 36 (1981); *United States v. Mitchell,* 463 U.S. 206, 228, 103 S.Ct. 2961, 2973–74, 77 L.Ed.2d 580 (1983). A claim would exist in this case only if the BIA failed to perform a duty Congress assigned to it under a statute.

The two statutes that could impose such a duty are the Menominee Forest Act, 35 Stat. 51 (1908), and the Termination Act, 25 U.S.C. §§ 891–902 (1970) (repealed 1973). There is no language in either statute, however, that delegates to the BIA the duty to determine the appropriate harvest or to lobby Congress for an annual cut in the forest that is most profitable for the Menominee.

The BIA could not ignore the congressional limitations on the allowable cut. Recognizing this fact, plaintiff argues that the BIA had a duty to request that Congress increase the allowable cut. It contends that Congress usually did what the BIA requested with regard to Indians, having never turned down

any similar requests dealing with the Menominee. However, as plaintiff admitted during oral argument, Congress was free to ignore any recommendation or request from the BIA. The only claims against the Government for breach of a fiduciary duty that have been recognized as valid arise as the result of agency action contrary to statutes that create a coherent enforceable standard of conduct for the agency. Those ingredients are not present here. Payment of the Forest Mismanagement claim would, therefore, constitute a gratuity.

### D. *Mill Mismanagement Claim*

■ The third count of the complaint deals with the mismanagement of the mill by the BIA. This count is different from the previous two because liability is not predicated on the passage of legislation. The Mill Mismanagement count is based on actions and inactions of the BIA during the time it was responsible for the day-to-day operation of the mill. The Tribe alleges that the BIA failed properly to repair or maintain the mill and failed to update the equipment to make it safe and efficient.

Trial Judge Spector held that a fiduciary relationship existed between the Government and the Tribe. Although the relationship was not created expressly, he found that the relationship began with article two of the Treaty of Wolf River, 10 Stat. 1065 (1854). The Menominee Forest Act, 35 Stat. 51 (1908), obligated the Government to "cause to be built, equipped and operated suitable sawmills, equipment and necessary buildings" for the manufacture of Menominee timber into lumber, and to employ tribal members to the extent possible. Trial Judge Spector held that a trust relationship existed due to the type of relationship created by these and other treaties and statutes. He characterized the Government as trustee and guardian of plaintiff and its property. The Government has not challenged this finding. Defendant concedes that the Mill Mismanagement claim is an equitable one. (Def.'s Br. of 11/8/96 at 22.) The court agrees in any event with the plaintiff that the web of statutes and treaties creates an obligation in BIA to oper-

ate and maintain the mill for the benefit of the Tribe as a fiduciary would. *See Mitchell,* 463 U.S. at 224, 103 S.Ct. at 2971–72.

In the first Mill Mismanagement claim, plaintiffs alleged twenty specific ways in which BIA had mismanaged the mill and breached its trust duties. Judge Spector agreed with respect to thirteen and awarded $5,469,536 in damages. The Mill Mismanagement count was later dismissed by the court, however, based on the Federal Circuit's decision in the Forest Mismanagement case with respect to the statute of limitations because the action occurred before 1961. As to this count, therefore, the congressional-reference statute requires the court initially to decide whether a reason exists to excuse the Tribe from filing its original claim in a timely fashion. *See* 28 U.S.C. § 2509(c) (1994). Only after that hurdle is crossed need the court address the merits of the claim that there was a breach of trust.

The Government has not raised the issue of laches here or argued that it has been unfairly prejudiced on account of delay. The congressional-reference statute nevertheless instructs the court to examine the issue. *See White Sands Ranchers v. United States,* 14 Cl.Ct. 559, 566 (1988). The court concludes that laches should not bar consideration of the claim. Notwithstanding the fact that the Termination Act was implemented in 1961, the Government has not been harmed by delay because the claim was previously litigated. The record before this court is made up of statements taken in a trial that took place in 1979. At that time, the memories of the witnesses and experts were not called into question.

1. Preclusive effect of *Menominee Basic & Menominee II*

The first obstacle to success for the Tribe here is defendant's argument that the decision of the Federal Circuit in *Menominee II,* 726 F.2d 718 (Fed.Cir.1984), is "preclusive" of any waiver issues for the Mill Mismanagement claim. The court had the following to say about the timeliness of the Forest Mismanagement claim:

It is settled, for one thing, that 28 U.S.C. Section 2501 is not tolled by the Indian's ignorance of their *legal* rights. . . . As to the facts, there is here plainly no such *concealment (e.g.* imposition of secrecy) by the defendant as would admittedly toll limitations. . . . Nor were the facts of potential injury from Interior's conduct "inherently unknowable" at the ordinary accrual date in 1952. Plaintiffs charge Interior's officials with that very knowledge which was also available to the Indians if they sought advice. The overwhelming weight of the evidence shows that the Indians were not so invincibly ignorant that they did not even know enough to make inquiry or seek advice.

*Menominee II,* 726 F.2d at 720–21 (citations & footnotes omitted). These findings, while they were directly related only to the Forest Mismanagement claim, were sufficiently compelling as to the Mill Mismanagement claim that Trial Judge Spector dismissed the latter claim on grounds of staleness. For that reason, the Government takes the position that these findings are inconsistent with the pending congressional reference.

 The court disagrees. The Federal Circuit's holding makes it plain that it is applying a different standard than would be applicable here. The cases cited by the Federal Circuit, such as *Japanese War Notes Claimants Ass'n v. United States,* 178 Ct.Cl. 630, 634, 373 F.2d 356, 358 (1967), apply the rigid test of whether the claim was concealed or inherently unknowable. The question of the statute of limitations in the context of a congressional reference, however, is approached differently. In the present context, as defendant concedes, the question is whether the plaintiff has shown good cause for not asserting its rights earlier. *See McQuown v. United States,* 199 Ct. Cl. 858, 874 (1974).

To get at the merits of the Mill Mismanagement claim, in other words, the plaintiff can argue excuses well beyond the limited grounds considered by the Federal Circuit. The existing congressional–reference precedents have found good cause, for example:

where the Government's administrative consideration of the claim was slipshod and desultory, thereby contributing to the delay which caused the damage; where the

claimant has relied on Government advice to his detriment; where he was not sleeping on his rights because justifiably relying on others; where the Government has been unjustly enriched; and where the failure to proceed in a timely fashion was the result of incapacity.

*Id.* (quoting M.T. Bennett, *Private Claims and Congressional References,* 9 A.F. JAG L.Rev. 9, 17–18 (Nov.–Dec. 1967)).[21] Although five reasons for finding good cause are listed, only one case is cited in the footnote as authority. That case is *S.N.T. Fratelli Gondrand v. United States,* 166 Ct.Cl. 473, 1964 WL 8545 (1964), in which the Government was found to have handled the plaintiff's case in a desultory and slipshod manner. None of the other reasons are exemplified in the case. It is noteworthy, however, that in both *Walls* and *McQuown,* as well as Judge Bennett's synopsis, the plaintiff's ability to bring the suit is considered relevant to whether there was good cause for waiver.

Plaintiff also points to other sources to flesh out what constitutes good cause in a congressional reference. For example, the Merit Systems Protection Board uses the following factors to determine whether a petitioner has shown good cause for waiving the twenty-day limit for appeal:

the length of the delay; whether appellant was notified of the time limit or was otherwise aware of it; the existence of circumstances beyond the control of the appellant which affected his ability to comply with the time limits; the degree to which negligence by the appellant has been shown to be present or absent; circumstances which show that any neglect involved is excusable neglect; a showing of unavoidable casualty or misfortune; and the extent and nature of the prejudice to the agency which would result from waiver of the time limit.

*Walls v. Merit Sys. Protection Bd.,* 29 F.3d 1578, 1582 (Fed.Cir.1994).

It is also helpful to examine the development in other types of cases of the concept that the statute of limitations is tolled when the plaintiff is hindered from bringing suit because of an inadequate ability to handle his own affairs. In *LaMear v. United States,* 9 Cl.Ct. 562 (1986), which is not a congressional reference, the court tolled the statute of limitations for a period of time under the "inherently unknowable" standard as to an individual who could not understand the terms of the transaction which underlay the case.

This concept is developed in tax cases brought by noncompetent Indians. The term "noncompetent Indian" refers to one who holds allotted land under a trust patent and who may not alienate or encumber that land without the consent of the United States. *See Hoptowit v. Commissioner,* 709 F.2d 564, 565 n. 1 (9th Cir.1983). Noncompetent Indians have certain tax advantages as to income earned on their allotted lands. At times they may pay taxes on income that should not have been taxed. "[A] refund claim can be filed by a restricted Indian at any time. . . . In other words, the noncompetency of an Indian tolls the applicability of the statutes of limitations." *Dodge v. United States,* 176 Ct.Cl. 476, 484, 362 F.2d 810, 815 (1966) (quoting *Daney v. United States,* 247 F.Supp. 533 (D.Kan.1965)). It is true that the Menominee are not considered noncompetent and that if the court were considering tolling the statute of limitations, there would be no special consideration for the Tribe. These decisions are cited merely to demonstrate that competence is a logical factor to consider in determining whether to waive the statute of limitations.

This review persuades the court that it has a great deal of flexibility in the more forgiving environment of a congressional reference

---

**21.** On other occasions, the court has not excused untimely filing. For example, in *McQuown,* plaintiff was fully aware of his rights and was determined not to bring suit because he thought it would endanger his job at a time he was nearing retirement and he did not "want to spend money to collect an honest debt." *McQuown,* 199 Ct.Cl. at 874–75; *see also Kanehl*

*v. United States,* 38 Fed.Cl. 89, 105 (1997); *White Sands Ranchers v. United States,* 14 Cl.Ct. 559 (1988); *Galen H. Clark Packing Co. v. United States,* 158 Ct.Cl. 93 (1962). In *Ralph Feffer & Sons v. United States,* 166 Ct.Cl. 506 (1964), and *Estate of Fairbank v. United States,* 164 Ct.Cl. 1, 1964 WL 8594 (1964), the plaintiffs offered no excuse.

and that considerations of the competence and capacity of the Tribe are relevant. The holdings of the earlier *Menominee Basic* and *Menominee II* decisions are not, to borrow defendant's term, "preclusive."

The court is nevertheless mindful that the Federal Circuit made certain findings in connection with the facts asserted to support the tolling argument in the Forest Mismanagement claim. The court treats those findings, insofar as they relate directly to the Mill Mismanagement claim, as part of the factual background here. They are of limited effect, however, because the Federal Circuit was dealing with a different claim and a different standard. What is presumably "known" at this stage is that the Menominee could have had access to the knowledge available to the Department of the Interior, "if they sought advice." *Menominee II,* 726 F.2d at 721. The Federal Circuit, of course, was referring to knowledge about mismanagement of the forest, not the mill.

It is also a given that there was "no such *concealment* by the defendant as would admittedly toll limitations." *Id.* It is not necessary in the present case, however, for the Tribe to show concealment.

The Tribe had also "successfully carried on the earlier suit (on another basis) against the United States for forest mismanagment and entered into a substantial settlement in 1951." *Id.* This finding, along with the statement that "the Indians were capable enough to seek advice, launch an inquiry, and discover through their agents the facts," speaks more directly to the relevant issue of capacity, and is treated separately below.

The court consequently holds that the rejection in earlier litigation of the tolling argument is no bar to considering the question in this congressional reference of whether good cause exists to waive the limitations period. Indeed, for reasons set out more fully below, the court finds that there is good cause for such a waiver with respect to the Mill Mismanagement claim.

2. Existence of good cause

The Tribe faced a number of obstacles to bringing a suit after 1951. Even under the best of circumstances, achieving consensus by an Indian tribe is not the same as a corporation deciding through its chief executive officer or even its board of directors to file a suit. The Menominee Tribe is not so much a corporate institution as a social or political one, operating through a representative democracy, with all the inherent inefficiency and indecision that implies. During the period after 1961, moreover, the MEI would have had to bring the suit. This entity, controlled by board, was additionally saddled by a substantial voting trust controlled by non-Menominee.

The period from 1954 to 1967, however, hardly represented the best of circumstances for the Menominee. Although the nature of the distraction varied during that period, there were substantial disruptive phenomena that impacted the Tribe's ability to identify and pursue legal claims. From 1954 until 1961 the Tribe had to face impending termination. It was thoroughly distracted by efforts to thwart the legislation or at a minimum to postpone it.

In addition, the Tribe had the responsibility for developing a termination plan, a task the MISC admitted would have been complex and difficult. The Tribe asked for help in forming the plan from the BIA and the MISC. The BIA could not offer much help because it cut back staff by fifty percent six months after the Termination Act was passed. The MISC informed the Tribe that it had problems such as lack of education and an inadequate tax base. The Tribe was aware of these problems, but when MISC was asked what to do about them, the committee stated it was the Tribe's job to make decisions about the plan.

In November 1957 the General Council voted to establish the Coordinating and Negotiating Committee (CNC) composed of the tribal chairman and three other members. These men were responsible for creating the termination plan. Because these men had other full-time jobs, they could only work on the plan on weekends and at night.

One of the members of the committee was George Kenote, who had left the reservation and worked for the BIA for twenty-eight

years. The BIA gave him a leave of absence to work for the Tribe, and his services were paid for by the Tribe. Most of the reports made by the CNC were written by Mr. Kenote. Mostly through his work, the Tribe finally developed a termination plan acceptable to the Secretary of the Interior. The burden of creating a termination plan, even though it was Congress and not the Tribe that wanted termination, lessened the amount of time and attention that other problems received. The Tribe could not be expected to understand the legal implications of the BIA's mismanagement of the mill when much of its attention was focused on developing a termination plan.

Defendant points to the Tribe's participation in preparation of the termination plan as evidence that they were able to organize and carry out complex tasks. However, the Tribe had no choice but to prepare the plan. In sum, it could only be expected to address the most pressing problem, which was how to deal with termination.

With some minor exceptions, the past century of functioning as dependents of the Federal Government left the Menominee incapable of dealing with any problems more subtle than coping with the effects of termination. The Menominee's "reservation" culture arose from years of dependence on the Government. Attitudes and practices that developed under the reservation culture could not be undone overnight. Anthropologist Dr. David W. Ames and Wisconsin State Senator William F. Trinke believed the Government should have at least given the Tribe twenty years to prepare its members to be self-reliant.

Another activity that took attention away from the mill was the creation of a county government. The Tribe had no experience in self-government. More than that, the Tribe had shown signs that it was uncomfortable with self-government. The Tribe had rejected the partial self-government offered in the Indian Reorganization Act of 1934 and preferred to stay under the a trust control of the

Government. Dr. Gary Orfield noted that: "The Menominee people lacked the first requisite for self-government—a fundamental sense of community and a consensus on common ends." (Pl.'s Ex. R–1 at 80.) The tribal government before termination interfered little in community differences. Once the tribal government was given the authority to settle community differences, the conflicts grew larger and brought planning to a standstill.

Defendant contends that the Tribe was sufficiently informed of problems with the mill that it should not be allowed to pursue the mismanagement claim at this late date. In its motion for summary judgment as to this claim, it relies on some of Trial Judge Spector's findings to support its view. For example, it cites Finding Number 401 for the proposition that plaintiff was involved with the mill manager regarding mill problems prior to 1959. This is a peculiar finding to cite, as it strongly supports the Tribe's position that the mill was grossly mismanaged and that the BIA had lost interest in running it properly. The finding lends no support to any asserted involvement by the Tribe in management of the mill. Indeed, the court observes that the Government consistently overreads the proposed findings of Indian involvement in the mill.[22]

Defendant asserts that plaintiff's own exhibits show that the Menominee had the knowledge and the ability to discover the mill mismanagement. Therefore, the argument goes, plaintiff did not have good reason to delay in bringing a claim. Defendant cites, for example, an April 1954 letter from the Agency Superintendent to the BIA Area Director (Pl.'s Ex. M–58), to show that the Menominee organized and studied a proposal to expand the mill. Plaintiff, however, uses a December 1954 BIA memorandum (Pl.'s Ex. B–40), to demonstrate that it was not the Tribe that originally suggested the mill improvements. The April 1954 letter states that the committee of fifteen Menominee that

---

**22.** For example, in its motion for summary judgment, defendant asserts that the Tribe's Supplemental Finding Number 12.14 demonstrates that it "employed a 'top notch' lumber operator from outside the reservation." The finding and min-

utes of the MISC that support it, however, merely reflect that "[t]he people on the reservation do not have the experience needed and they want to be able to get a 'top notch' lumber operator...." (Pl.'s Ex. R–50 at 35.)

studied the proposal met only twice for a total of seven hours. The court is persuaded that the statement in the superintendent's letter that the mill-expansion program had been the subject of much study by the Tribe is an exaggeration. The December memorandum indicates the plan that was approved in 1954 (although never executed) was not actually submitted by the area director until June 1954. (*See* Pl.'s Exs. B–40 & M–58.) The Menominee were meeting on the BIA's initiative and operating on information the BIA supplied to them.

Defendant also points to a quote from the minutes of the Menominee Advisory Council on March 19, 1954. That excerpt suggests that members of the Tribe had requested expansion of the mill and that some members had complained about the efficiency of the mill. This does not show that the Tribe understood it had a claim for mismanagement. To toll the limitations period, such a modicum of awareness would be enough to keep the time running, but the court is not asked to toll the statute. The court must decide whether good cause exists to waive the statute of limitations. Although knowledge of symptoms is a factor in that inquiry, it is not the only one.

Defendant also cites Finding Number 403 as evidence that the Tribe was aware of the down time at the mill. This finding does not directly speak to the Tribe's knowledge. It merely reflects the fact of down time. The court is willing to presume that mill workers knew when the mill was idle. That fact in itself does not, in the present context, mean the Tribal leadership should be faulted for not suing the Government immediately for mismanagement. The same is true of the citation to Finding Numbers 406 and 410, where the mill's dismal accident record, as well as a long litany of quality defects and inefficiencies, are noted. General awareness of such ongoing symptoms of more fundamental underlying problems would, in a typical case, put a putative litigant on notice of a claim. The court, however, declines to apply such a standard here.

The clearest instance of notice to the Tribe of problems with the mill appears in the minutes of a meeting of the Forestry and Mills Committee of the Tribal Council on December 8, 1959. A sales representative for the mill testified that there were a number of inefficiencies in the mill operation that could be corrected to make the mill more efficient. He specifically suggested that regrading could net $25,000 more per year in income. This prompted a 1960 request by the Tribe to the BIA to investigate matters.

Some related background must be recited at this point. The most relevant is that it is obvious from this and other such instances that the Tribe itself felt incompetent to make such an investigation. This is apparent from the following excerpt from Council minutes:

> Some very serious allegations were made about the manner by which lumber had been piled, the manner by which it had been processed through the Mill, the manner in which it had been handled in the Planing Mill. There were serious and extremely serious charges of upgrading of lumber and neglect on the part of [the] former manager, in processing logs through the mill and allowing them to remain on the landing and in the hot pond, for a period of three years. Now I'm not in a position to know whether these are accurate charges. I don't believe any member of the Council is in a position to know how accurate those charges are.... [W]e as members of the Tribe, or as Council members, are in no position, no real position to sift the truth from the false reports that develop.

(Pl.'s Supp. Ex. 65 at 41 (statement of Councilmember Gordon Dickie in minutes of Tribal Council meeting of 7/26/60).)

Moreover, an earlier similar request for an efficiency study of the mill had fizzled away into BIA postponements, and the proposed study was not performed on the grounds that the expense for it was not a reimbursable termination expense. It was thus left for the future.

In her 1996 extensive report on the mill, Dr. Jean Mater explains that the Menominee were "not trained to know or understand that many of the management practices and decisions were not in the best interest of the Tribe. Nor were they provided with ade-

quate or accurate information." (Pl.'s Ex. JM–1 at 22.) The particular elements of the Mill Mismanagement claim, for example, that the Tribe should have bought a debarker or bought power instead of burning chips, that the boiler was obsolete, or that a veneer mill should have been built are defects in operation that would have required more sophistication than the workers possessed—a shortcoming that resulted in part from the BIA's exclusion of the Menominee from management.

That the Tribe, moreover, had been assured by the superintendent of the BIA that "[t]he sawmill ... is now one of the most modern and efficient plants in the Middle West," (Pl.'s Ex. B–22 at 11), is reflected in the minutes of the General Council. (Pl.'s Supp. Ex. 63 at 27.) The mill managers were quoted at Senate hearings as saying that the sawmill was "one of the most modern" in the nation. *1960 Amendments to the Menominee Indian Termination Act of 1954: Hearings before the Subcomm. on Indian Affairs,* 86th Cong. 64 (1960).

It also must be recognized that in order to incur any expenses in an audit or investigation, the Menominee had to get permission from the BIA to spend their own money. In 1960 the Menominee thus asked that the BIA investigate the charges Councilmember Dickie had repeated. This request was in addition to an ongoing request, later answered through the initial Mater Report,[23] for a study of the efficiency of the mill. The BIA responded by sending John Shanklin, a BIA forestry employee, to the reservation in June 1960. He reported that there was no need for an investigation beyond that which Mater Engineering would do, and that

I found no evidence suggestive of possible irregularities or corruption which might provide [a] basis for an irregularity-type investigation.... The Mater ... report, which is due in October, will indicate ways

and means of improving the manufacturing process.... [I]t is my recommendation that no further action be taken on [the Menominee Indian Advisory Council resolution requesting an investigation of mill operations].

(Pl.'s Ex. G–108.) The mill, meanwhile, had a new BIA manager, who was urging that the Tribe delay any changes at the mill until he had had an opportunity to straighten things out and until the Mater Report.

The court has reviewed the extensive excerpts from the General Council and Advisory Council meetings during this period. It is impossible to read them without coming away with the strong impression that the Tribe was willing to go along with delay in pursuing modernization at the mill, pending the Mater Report, in the hope that the report would persuade Congress to further delay termination. Moreover, the strong impression left by the BIA, and accepted by the Tribe, was that the problems were ones of inefficiency, not of mismanagement per se. The initial Mater Report was issued in November 1960. (*See* Pl.'s Ex. M–28.) It noted a number of problems and made many recommendations. The upshot of it, from the Tribe's perspective, was that it would take three or four years to get the mill operating at a level of efficiency adequate to self-sufficiency. It is thus not surprising that the Tribe was more interested in protecting itself in the future by preserving the only asset it had through modernization. The Tribe thus ended up investing in unsuccessful efforts to obtain money from Congress for modernization and for postponement of termination.

The prospect of immediate termination left the Tribe with a limited number of actions that could receive its attention. The court finds that the Tribal leaders' concern in the period after 1954 was improving the mill to make it capable of generating more revenue. The Government was responsible for putting

---

**23.** Plaintiffs submitted three reports by Mater Engineering. The first report identified problems at the Menominee sawmill and was produced in 1960 by Milton H. Mater, a professional engineer who specialized in sawmill engineering, and Dr. Jean Mater, Ph.D., an expert in forest products chemistry. (*See* Pl.'s Ex. M–28.) A second report recommended a modernization plan and was issued in 1971. (*See* Pl.'s Ex. M–1.) A more recent report entitled "Analysis of Opinion of Judge Louis Spector in *Menominee Tribe v. United States*" was produced in 1996 by Dr. Mater and Scott Mater, a professional engineer and son of Milton and Jean Mater. (*See* Pl.'s Ex. JM–1.)

the Tribe in the position of having that concern, and the court will not fault the Tribe for not doing two things at the same time. Understandably, recriminations and lawsuits were low priorities.

Dr. Jean Mater's more recent report explains in some detail that the Tribe before 1961 was understandably ignorant of the real problems with the mill. (*See* Pl.'s Ex. JM–1.) She and her husband have over thirty years of experience studying the Menominee Tribe and specifically the mill issue. The court assigns significant weight to their findings. They concluded in their reports that the Menominee were not sufficiently trained or placed highly enough in management to fully comprehend the significance of all the day-to-day problems encountered at the mill.

Things did not improve after termination. This is supported by other evidence of the mentality of dependence. In 1956 the MISC wrote that the Government's "cradle to the grave" responsibility for tribal affairs extended to the operation of the mill and extended into the termination period. As one Indian affiant stated, the attitude of the workers was that "the fact that our forest or mill might have had a potential claim for mismanagement would have been way down on our list of priorities. If there were problems that should have been fixed, I assumed the BIA, or after Termination, the MEI would take care of it. That was their responsibility." (Pl.'s Supp. Ex. 4 ¶ 4 (Washinawatok aff.).)

After 1961 the Tribe had to cope with the disastrous consequences of termination—effects that created massive new social problems and destroyed the cohesiveness of the Tribe as a functional unit. The court finds that the Tribe was so overwhelmed in dealing with the possibility and then the reality of termination that it could not deal with filing a claim for mismanagement of the mill. The existing problems of abject poverty, illness, and lack of education and industry were amplified by a new one: the Tribe was responsible for coping with these issues by itself, having had no experience in doing so. As President Nixon wrote in urging repeal of termination legislation: "[One] reason for rejecting forced termination is that the prac-

tical results have been clearly harmful in the few instances in which termination actually has been tried.... [The Indians'] economic and social condition has often been worse after termination than it was before." H.R. Doc. No. 91–363, at 2 (1970) (Pl.'s Ex. G–178) (referring to Indian tribes generally). It is unreasonable to expect any group of individuals to ignore basic problems of providing food, clothing, shelter, and medical care to pursue a case for mismanagement of a mill with which they had had limited dealings other than as hourly employees.

While there is evidence that the Tribe was concerned about mismanagement prior to 1961, that very awareness before termination makes it more telling that nothing was done about those problems during the period after termination. Something had to cause that inaction. The Government would have the court penalize the Tribe, contending that inaction was the result of tribal neglect. The court is persuaded, however, that the Tribe's inaction after 1961 was in primary measure the Government's own fault. It was a direct result of the decision to terminate the Tribe.

Termination also had the effect of making it more difficult to organize into one unified voice. Tribal government ceased to exist after the Termination Act went into effect. Both the General Council and the Advisory Council no longer played a role in the governing of the Menominee people. In its place, the Menominee Common Stock and Voting Trust became the forum for the tribal members to express their ideas and attitudes on how the Tribe should proceed on certain affairs. This voting trust had a board that consisted of seven members. The board selected nine individuals, five of whom were non-Menominee, to serve on the board of directors of MEI, the corporation that managed the assets of the Tribe.

The termination legislation required an entity to hold the voting certificates of Menominee minors and incompetents. That entity was the First Wisconsin Trust Company of Milwaukee. In the annual elections for trustees from 1961 to 1968, the bank cast from 80% to 93% of the votes. From 1962 to 1970 the number of individual Menominee members voting in trustee elections fell from

17.8% to 3%. The reasons for the decline in the Menominee percentage were that many did not have information on when the votes were taking place, many had dispersed to the cities, many did not understand the issues involved, and some stayed away to protest the amount of control the bank had in voting. The Menominee often expressed dissatisfaction with an idea by not attending a meeting where that topic was discussed. For this reason, many Menominee stayed away from meetings that discussed ways to deal with termination. Many members of the Tribe were convinced that termination could not proceed without their participation. They did not realize that by not dealing with the problems early, they were not halting termination but only making things more difficult. What it took to unify the Menominee was a problem with less subtlety and more immediacy than mill mismanagement. Even then, the members of the Tribe had to urge the MEI to act.

The Government argues that the fact that the Tribe had employed very capable lawyers to pursue rights in the past shows that the Tribe was able to understand its rights and to employ lawyers to advocate those rights. However, the examples of the cases the Tribe pursued are different than the facts here. This is exemplified by the problems the Tribe encountered when three of its members needed legal representation to defend the Tribe's hunting and fishing rights, an issue about which the entire Tribe cared. The three men were arrested on September 8, 1962. The implications of the arrest were that the Tribe was limited in its ability to hunt by the state gaming laws. Such a loss was an issue about which every member of the Tribe had strong feelings. A well-attended community meeting was called, and emotions ran high.

The meeting resulted in a delegation that was sent to MEI to ask for a contribution for attorney's fees. MEI agreed to pay $1200. The accused won at the trial level, but the state appealed and won. Once again the MEI Board was convinced to contribute $1000 towards legal fees. After certiorari was denied to the U.S. Supreme Court, the Menominee wanted to sue in the U.S. Court of Claims for damages. With some reluctance, MEI agreed to fund attorney's fees for this stage. After the U.S. Court of Claims ruled that the Tribe still had its hunting and fishing rights, the U.S. Supreme Court settled the split of authority and ruled that the Menominee's hunting and fishing rights survived termination.

Although the Tribe was able to successfully regain its gaming rights through court action starting in 1962, that injury contained the unique ingredients necessary for the Tribe to unify in action. The injury was immediate and highly visible. The arrest of tribal members for hunting and fishing was evident to all members. The issue directly affected the members' immediate livelihoods and sense of control over traditional lands and resources. The effect of the arrests was, understandably, to galvanize feeling into immediate action. As Jim Washinawatok testified, Wisconsin's assertion of state control over hunting and fishing rights "struck a raw nerve in the whole community." A letter between the lawyers representing the Tribe reflects that the state's action "has affected a tremendous emotional impact on many tribesmen, not only those who actually hunt and fish, but also as to many who do not...." (Supp.Ex. 115.)

The litigation resolved in the 1951 settlement was brought at a time when the Tribe was not facing termination. In addition the claims were more readily noticeable. One arose from the clear cutting of Menominee land. Another was precipitated by the Secretary of the Interior's failure to harvest quickly timber blown down in a wind storm causing some of it to rot. This suit, in any event, started in 1938 and consumed the Tribe's attention and resources for thirteen years. As Dr. David R. Wrone, professor of American Indian history at the University of Wisconsin–Stevens Point, points out, this litigation was in some senses a disincentive to sue.

To say, as the Government does, that lawyers employed by the Tribe on other matters should have noticed the mismanagement and promoted litigation is to misconstrue their proper role. The lawyers worked on matters that the Tribe brought to their attention. The Menominee requested help with prob-

**471**

lems they could easily see, such as hunting and fishing rights and over–cutting the forest. The Tribe knew that it did not want to terminate Government control and directed its lawyers to pursue that course. Recognizing that the Tribe had virtually no knowledge about how to manage a mill, the court will not penalize them simply because their lawyers, retained on other matters, did not suggest initiating litigation over the mill.

The preceding recitation persuades the court that the test for waiver is met. Despite the rejection, both herein and in the earlier litigation of the legal and equitable grounds for the Basic claim, the facts underlying that claim and the fair inferences from them have never been questioned: The Menominee were totally dependent wards of the Government; their private lives were dependent on the Federal Government, who controlled their corporate lives; they were a simple, unsophisticated people; the Menominee were not ready for termination of their dependent status in 1954 or 1961; the Tribe was generally aware of problems with the mill but lacked any specific understanding of how those problems could be argued as actionable mismanagement by the BIA; the prospect and then the reality of termination completely absorbed and disrupted the Tribe.

The Tribe, in short, went through a period—admittedly difficult to quantify—in which it had good cause for not prosecuting claims. The Tribe was suffering from a substantially diminished capacity for the kind of concentrated, purposeful action required to bring a suit. Under those circumstances, it would nullify the good-cause standard to invoke the statute of limitations in a congressional reference to block what might otherwise be legitimate claims that the Government violated its trust relationship with the Tribe. The court is satisfied that good cause exists to treat that period of incapacity as excusing nonfiling during the entire period between 1954 and 1967 and to address the Mill Mismanagement claim on the merits.

## CONCLUSION

Any relief given to plaintiff for the Basic claim or the Forest Mismanagement claim would be a gratuity. For this reason, the court grants the defendant's motions for summary judgment as to those two counts. The plaintiffs motion for summary judgment as to the Basic and Forest Mismanagement claims is denied. Defendant's motion for summary judgment in the Mill Mismanagement claim is denied because there was good cause for the plaintiff's delay in bringing the claim. Due to the parties' concentration on legal defenses to the first three claims, little attention was given to the merits of the various elements of the Mill Mismanagement claim or to the proof of damages. In addition, the other nine counts remain to be addressed in light of this ruling. Accordingly, plaintiff's motion for summary judgment in the Mill Mismanagement claim is denied without prejudice to reassertion in conjunction with cross motions on all remaining counts. The court will convene a status conference to schedule briefing on remaining matters.